Ira Royal L. TRIBE et al., Plaintiffs
and Appellants,

v.

SALT LAKE CITY CORPORATION and
Redevelopment Agency of Salt Lake City
et al., Defendants and Respondents.

No. 13856.

Supreme Court of Utah.

July 30, 1975.

H. R. Waldo, Jr., Michael D. Hughes, W. Robert Wright, and Ronald Ockey of Jones, Waldo, Holbrook & McDonough, Salt Lake City, for plaintiffs-appellants.

Richard S. Fox and William D. Oswald of Strong, Poelman & Fox, Salt Lake City, for defendants-respondents.

Parley R. Baldwin, Ogden, for amicus curiae.

MAUGHAN, Justice:

Here on appeal is the decision of the district court declaring the Utah Neighborhood Development Act [1] constitutional, and that actions taken and proposed to be taken pursuant to those statutory provisions are constitutionally permissible.

Plaintiffs commenced a declaratory judgment action in the court below with the alleged purpose of having the foregoing statutes and actions declared unconstitutional. On appeal plaintiffs raise seven points, any one of the first five of which, if valid, would be sufficient to reverse the action of the lower court, and defeat the proposed project. In summary, the points raised by plaintiffs are:

1. That the Redevelopment Agency proposed is in fact a special commission and contravenes the provisions of Article VI, Section 28, Utah Constitution.

2. The proposed Redevelopment Agency bonds constitute a debt of the City within the meaning of Article XIV, Sections 3 and 4, Utah Constitution, and thus would require approval of the electorate of the City—an action which will not be taken under the proposed plan.

3. The proposed plan contravenes the provisions of Article VI, Section 29, Utah Constitution, because the issuance of the proposed bonds would in fact be a lending of credit in violation of this constitutional provision.

4. The construction and operation of the proposed parking facility will result in the granting of private benefits, and thus contravene Article I, Sections 7, 22, 23 and 24, Utah Constitution, and the Fourteenth Amendment to the United States Constitution.

5. The proposed plan is in violation of Article XIII, Section 5, Utah Constitution, because the tax allocation provisions of the plan are a clear interference with the power of the City and County to collect taxes for all purposes.

6. That the Redevelopment Agency is subject to the budgetary laws applicable to cities.

7. That the proposed allocation of taxes using an assessed valuation base of 1970 constitutes a retroactive application of the enabling law, and thus violates proper principles of statutory construction.

In June of 1969, Salt Lake City Corporation created the Redevelopment Agency of Salt Lake City, (hereinafter referred to as the Agency) pursuant to the provisions of the Utah Neighborhood Development Act (hereinafter referred to as the Act). The Board of Commissioners of Salt Lake City Corporation was designated as the Redevelopment Agency of the City. In February of 1971, the City duly adopted an ordinance approving a redevelopment plan for the project area with which we are here concerned, viz., the blocks and streets adjacent thereto, of the two-block area bounded on the north by First South Street, on the east by Main Street, on the

1. 11–19–1 et seq., U.C.A.1953; and Chapter IV, Laws of Utah 1974.

south by Third South Street, and on the west by West Temple Street.

The plan recognized that in this project area there were a number of substandard buildings and substandard land use; and that through rehabilitation, in some cases, or acquisition, clearance and rebuilding in other cases, the project area could be improved, with the result, among other things of strengthening the tax base and ameliorating the economic health of the entire community. Within this area the plan called for the construction and operation of a parking facility, to be financed by the issuance of $15,000,000 of tax allocation and parking revenue bonds. These bonds are to be retired by parking revenues and from an allocation of taxes, the formula for which is given in the Act.[2] The allocation of taxes comes about in the following fashion: A base year is chosen (in this instance 1970) which year provided the last equalized assessment roll prior to February 11, 1971, the date of the adoption of the original redevelopment plan. On that date there was no possibility of providing for an allocation of taxes to the Agency, because it was not until April 4, 1974, that such a method of financing was provided by the legislature.[3] Taxes assessed within the project area will continue to be paid to the various taxing agencies, through normal channels, based on the assessed valuation established by the assessment roll of 1970.

Any increase in valuation, above that established by the assessment roll of 1970, within the project area, will produce an increment in tax revenue. It is this increment which will be diverted directly to retire the Agency bonds. This tax allocation together with the anticipated revenues from the operation of the parking facility will constitute the sole revenues obligated to retire the bonds. The plan provides that this method continues until such time

as the bonds are retired, after which the total taxes assessed will find their way, through normal channels, to the various taxing agencies, while the revenue arising from the operation of the parking facility becomes that of the Agency, for use in future redevelopment projects. It is this tax allocation feature which is central to the matters here for consideration.

Are the Agency, and its methods for implementing its objects constitutionally permissible? The answer to this question hinges on whether the objects and purposes of the Act are statewide or local; and whether the Agency, as structured by the Act, is such a one as can concurrently exist with municipal corporations and assessment units.

The concept of redevelopment was enacted by the state legislature, its area of operation is statewide, and deals with a statewide problem, viz., blight. To be sure, the present project area would appear to have only local operation, but it must be remembered that it is a local operation of an act of general statewide scope; and that its local operation hinges on a contingency—the decision of the legislative body of the Agency. A decision motivated by the existence of a condition of statewide concern.

It appears clear that the Agency here concerned is a quasi-municipal corporation, and not a special commission. A quasi-municipal corporation has been defined as a public agency created by the legislature to aid the state in some public work for the general welfare, other than to perform as another community government.[4] A municipal corporation is a body politic and corporate, created to administer the internal concerns of the district embraced within its corporate limits; in matters peculiar to such place and not common to the state at large. A special commission is some body or group separate

2. Section 6, Chapter 4, Laws of Utah 1974.

3. Id. Chapter 4, effective date April 4, 1974.

4. 1 McQuillin, Municipal Corporations, 3d Ed., Sec. 2.13, p. 467.

and distinct from municipal government. Such a commission is not offensive to the constitution by its creation, but only when such a commission is delegated powers which intrude into areas of purely municipal concern.

The success of plaintiff's challenges depends upon the character of the agency created by the legislature. If the legislative enactment authorizes the performance of activities, which qualify as a function appropriately performed by a state agency, the constitutional interdiction of Article VI, Section 28, is not applicable. This section applies only to *municipal* functions, the performance of which are constitutionally limited to the units of local government.[5] The problem of "urban blight" we recognize as one of statewide concern, and not merely a local or municipal problem. The agency for that reason does not run counter to Article VI, Section 28. The agency is a quasi-municipal corporation, a public agency created for beneficial and necessary public purposes. It is not a true municipal corporation, having power of local government, but an agency of the state designed for state purposes. Since it is a quasi-municipal corporation, formed for public purposes, it is within the discretion of the legislature to grant it any powers, not expressly prohibited by the constitution, to further such purposes, including the power of taxation. The public purposes for which the agency is organized inures to the benefit of the public generally, therefore the public may be charged for such benefits through general taxation.[6] The agency is separate and apart from the city government, and yet is administered by a legislature body responsible to the local electorate.

The Act[7] specifically provides that the bonds and other obligations of the agency are not a debt or obligation of the community (which is defined in the Act as a city, county or combination of the two), the state, or any of its political subdivisions. In addition, the enabling statute,[8] the proposed bond resolution, the proposed bond form, and the city ordinance of ratification all prohibit the use of credit of the city for the repayment of the bonded indebtedness. The bondholders can look only to revenues from the operation of the facility and the allocated taxes, for retirement of the bond obligation. Under the subject statute, providing for this arrangement, there can be no city debt created contrary to Article XIV, Sections 3 and 4; nor can there be a lending of the city's credit in contravention of Article VI, Section 29.

In *Patterick v. Carbon Water Conservancy District*[9] this court stated that the constitutional inhibitions of Sections 3 and 4 of Article XIV apply only to cities, towns and villages and subdivisions thereof, and do not apply to quasi-municipal corporations, which are not municipalities within the contemplation of that term, as used in the constitution. A quasi-municipal corporation is an arm of the state government separate and distinct from any municipality, with powers and rules of its own, and the mere fact that its territorial boundaries may encompass or impinge upon the territorial boundaries of a municipality does not make it a part of the city, for its powers are distinct and separate.[10]

With reference to appellant's claim that procedures under this Act, as proposed, will grant private benefits through

5. *Carter v. Beaver County Service Area No. One*, 16 Utah 2d 280, 282, 399 P.2d 440 (1965).

6. *Patterick v. Carbon Water Conservancy Dist.*, 106 Utah 55, 71–72, 145 P.2d 503 (1944).

7. 11–19–25, Laws of Utah 1974.

8. *Id.* 11–19–23.3, 25–35.

9. Footnote 6.

10. *Lehi City v. Meiling*, 87 Utah 237, 256–257, 48 P.2d 530 (1935).

the use of public money, we note that there may be some private benefits—it is hard to imagine how a facility such as the one proposed here could be constructed without conferring a benefit on some private individual or individuals—but any benefit which might inure to a private individual through the construction of the parking facility is strictly incidental to the public purpose of the agency in redeveloping the area to terminate urban blight. The funds are being used by a public body for a public purpose, i. e., to terminate urban blight; they are not being given or loaned to a private person, nor are they used primarily for private purposes. This particular question was dealt with in *Redevelopment Agency of the City and County of San Francisco v. Hayes.*[11] The court there said that the fundamental test of the constitutionality of the statute requiring the use of public funds is whether the statute is designed to promote the public interest, as opposed to the furtherance of the advantage of individuals; and such a statute should not be declared unconstitutional because of the fact that, incidental to the main purpose, there results an advantage to individuals.

■ Directing our attention now to appellants' claim that the allocation of taxes violates Article XIII, Section 5, it needs only to be said that the law is well settled that in exercising the powers of the state the legislature may require the revenue of a municipality, raised by taxation, to be applied to uses other than that for which the taxes were levied. Its power is, of course, subject to constitutional limitations, but here we see no specific constitutional limitation which has been offended, or which expressly prohibits the powers conferred on the agency by the statutes in question, or to the actions taken by the agency pursuant thereto.[12]

■ What has been heretofore said about the provisions of the Act, its objects and purposes; and the nature of the agency renders inapplicable the Uniform Municipal Fiscal Procedures Act.[13] Thus, plaintiffs' sixth assignment of error is without merit.

It remains only to deal with appellants' point No. 7, where it is claimed that the retroactive application of the Enabling Act is in violation of proper principles of statutory construction.

■ Section 11–19–23 of that Act permits the amendment of an existing redevelopment plan, and such amendment does not create a new or separate redevelopment plan. In the matter at hand, the plan was amended to include the statutory allocation as a means of financing the project. Section 11–19–29, specifically provides that any redevelopment plan may contain a provision for tax allocation "after the effective date of the ordinance approving the development plan." The term "redevelopment plan" in 11–19–29(1) refers to the *original* redevelopment plan, and the effective date of the ordinance creating the plan establishes the base to which the allocation formula is applied.[14]

For the foregoing reasons we sustain the decision of the trial court and hold that the Utah Neighborhood Development Act is a constitutional exercise of state power by the legislature, and that the proposed issue of parking revenue and tax allocation bonds are constitutionally permissible. No costs awarded.

---

11. 122 Cal.App.2d 777, 266 P.2d 105, 125 (1954).

12. *Salt Lake County v. Salt Lake City*, 42 Utah 548, 134 P. 560 (1913); McQuillin, Municipal Corporations, Rev. Vol. 1966, Section 4.140.

13. 10–10–23 et seq., U.C.A.1953, as amended.

14. See *Redevelopment Agency of City and County of San Francisco v. Cooper*, 267 Cal. App.2d 70, 72 Cal.Rptr. 557 (1968), wherein a similar interpretation was based upon similar statutory provisions.

TUCKETT, J., concurs.

ELLETT, J., concurs in the opinion and also concurs in the concurring opinion of CROCKETT, J.

CROCKETT, Justice (concurring specially).

The desirability of seeing a way to approve this plan to salvage and renovate the inner city is to be conceded. Nevertheless, it is our obligation to make an objective analysis of the application of the law to this proposal, for which purpose I make these observations:

The proposition which must be forthrightly faced is this: the proposed bonds should be regarded as either one classification or the other: they are either A, "revenue bonds," i. e., which are to be paid, interest and amortization of the principal, by the revenues derived from the project; or, B, they are not revenue bonds, but are to be financed by the revenues, and also by taxes to be imposed and collected by the city.

If these bonds were clearly under classification A, there would be no problem and no need of this lawsuit. But if they fall under classification B, then these questions are confronted: whether this plan is a lending of the city's credit for a private purpose, forbidden by Art. VI, Sec. 29, Utah Constitution, whether the bonds constitute a debt against the city, and are thus governed by the laws applicable thereto, including Sections 3 and 4, Article XIV, Utah Constitution, and whether there need be a bond election.

The recital that the bonds are not obligations of the community (the city) is not controlling. Neither is the fact that the bond resolution, the bond form and the approving city ordinance so recite. It is necessary to look beyond those recitals to the actual arrangement to determine the character of the bond issue. The main opinion correctly states that "The bond holders can look only to the revenues from the operation of the facility *and the allocated taxes . . . ."*

There is somewhat of a paradox in this situation, because this plan appears to have been devised for the purpose of having the bonds fall within classification A above, so they can be treated as revenue bonds, and not as general obligations of the city; [1] and at the same time have the payment of the bonds assured, at least in part, by taxes levied and collected by the city. The fact cannot be ignored that this support from taxes is intended to make the bonds more salable and at a lower interest rate.

Plaintiffs argue, and not without plausibility, that because theirs and other property in the city is subject to any increased taxation in future years, and that, unless the project area property is similarly taxed and bears its proportionate share of any such increases, plaintiff's property will be bearing a disproportionate share of the city's financial burdens, and thus deprived of equal treatment under the law. Whereas, defendants point out that the property in the project area had been declining in assessed value for a number of years; and that this project has the potential for resulting in improvements in the area which will enhance the assessed valuation estimated at variously from 32 million to 49 million dollars; so that if the project property pays taxes on the basis of the base year, 1970, it will be bearing its fair share of city taxes, and providing the potential for a much greater amount as time goes on.

It seems obvious that if it is the *amount of taxes in dollars* paid on the project property in the base year, 1970, which is pegged down, then as the taxes on other property increase in subsequent years (and experience teaches that there will be such increase) there will be unjust discrimination against and unequal treatment of the

1. See *Lehi City v. Meiling,* 87 Utah 237, 48 P.2d 530; *Allen v. Tooele County,* 21 Utah 2d 383, 445 P.2d 994 and authorities therein cited.

plaintiffs, who will be bearing a disproportionate share of the city's tax burden. But in looking at the overall picture, any such inequity may be minimized or perhaps eliminated if it is the taxation on *the assessed valuation of the property in the project area*, which is pegged down as of 1970, and if the total fair assessed evaluation is subject to taxation, including any increased mill rate of taxes levied in subsequent years, and it is *only the extra taxes generated from the amount of increased valuation over the base year, 1970*, that is diverted into a special fund and used to pay on the bonds.

If, and when, the assessment roll in succeeding years shows amounts in excess of the base year limit, then such amounts as exceed that limit are to be directly diverted toward the retirement of the Agency bonds, and this tax allocation together with the anticipated revenues from the operation of the parking facility will constitute the sole revenues obligated to retire the bonds.

It seems to me of importance that in order to meet the problems raised by the plaintiffs, and for the act to be valid, it must be interpreted as advocated herein, based on these propositions: that for the purpose of carrying out this project it is *the assessed valuation of the project area property* which is pegged down as of the base year, 1970, and *not the amount of dollars paid in taxes that year*; that the mill rate levy, whatever it may be in future years, will apply to the actual assessed valuation of the project property each year, the same as to all other property in the city; that on the 1970 assessed valuation the current mill rate levy for each year will be paid into the city's general tax funds (the taxing entities); and it is only

the taxes (imposed at the same prevailing mill rate) which result from *increased valuation* in the project area, that will go to finance the bonds.[2]

By this payment of taxes into the city's general tax fund, on the 1970 valuation of property in the project area, but based on the prevailing mill rate for all other property in the city, that area will be paying the same proportion of city taxes as it would have paid if the project had not been initiated and no improvement had taken place. This would seem to eliminate any inequity or discrimination against the plaintiffs and other tax payers; and to serve the desirable objective of reversing the trend of decreasing values and moving toward the enhancement of property values with concomitant increase in tax sources to help bear the burdens of the city and incidently of the plaintiffs and other tax payers similarly situated.

The other major aspect of plaintiffs' attack on this act and the creation of the Neighborhood Redevelopment Agency is that it violates Sec. 28 of Art. VI of our Utah Constitution which prohibits delegation to any special commission the power to perform or interfere with municipal functions. Defendant's rejoinder is that the act does not create any such entity. It authorizes the city itself, through its Board of Commissioners, to form such an agency; and that the control of the agency is in the City Commission, and the people control the Commission through the election process, so there is no actual delegation of the powers of the city to this agency.[3] This is another seeming paradox through which the defendants must tread their way with caution. After the above assertion that the control is in fact in the City Commission, they say in the next

2. This financing method is sometime called the "tax increment" doctrine. But I think it should be more correctly called the "valuation increment" doctrine, indicating that it is the increase in value, taxed at whatever the current tax rate is in succeeding years, which provides the special fund to finance the bonds.

3. See *Belovsky v. Redevelopment Authority*, 357 Pa. 329, 54 A.2d 277; *City of Aurora v. Aurora Sanitation District*, 112 Colo. 406, 149 P.2d 662; *City of Whittier v. Dickson*, 24 Cal.2d 664, 151 P.2d 5.

breath that the Agency is not in fact the city, but a separate quasi-municipal corporation, and therefore not subject to the constitutional and statutory regulations and restrictions imposed upon cities.

The significant points to note here are that this plan does not provide for nor contemplate that the City can or will impose any tax, or increase any mill levy, to support this Agency or its purposes, or to finance these bonds. Further, the Agency itself has no power to impose or collect any taxes, but its only benefit therefrom will be from the special fund set aside from the increased taxes generated by the enhancement of assessed valuation of property in the project area. The act does not empower the Agency to in any way perform any function of the City or interfere with its affairs.

In accordance with the ideas herein expressed in supplementation of the main opinion, I concur in affirmance of the trial court's judgment refusing to declare the act unconstitutional.

HENRIOD, Chief Justice (dissenting).

I dissent (July 29, 1975). There are some minor differences of opinion among us as to the precise wording of the decision which is and will be the law of this case. However, four of the members of this Court are in harmony with the main opinion, which is to the effect that the trial court is affirmed in its judgment holding the so-called "tax increment" statute (Chapter 4, Laws of Utah 1974), which I think should be called the "Tax Rebate Statute" titled in the statutes as the "Neighborhood Development Act," effective and constitutional.

In my opinion, this case represents one that is *not* an adversary proceeding, has *no* character as to justiciable controversy, is unilateral in objectivity, represents an apparent obeisance to self-interest pressure groups, is devoid of any outcry by the so-called protestants,—a case where both sides seem to furnish not only the silage that created some straw men, all of whom were fired upon, burned and killed, by the double-barreled musket of extinction, the triggers of which were pulled, one by the one side and one by the other.

Besides all this, I consider this case to be a $15,000,000 rip-off of taxpayers' money that ordinarily and constitutionally would have gone into the general fund owned by the citizens of Salt Lake City,— denied to them by a somewhat rediculous two-hatted special commission that statutorily plays musical chairs on an eccentric carousel, providing a vehicle for an insurance policy against liability,—the premium for which is paid by a small filing fee, a large attorneys' fee, and a taxpayer's migraine headache.

I am well aware that after legislative approval, lobbyist participation, municipal Commission approbation, this dissent may be anathema to some interests and pressures that may have "engineered" this admittedly novel legislation,[1] that seems to have had the planning, timing and strategy, wonted to be characteristic of The Great Train Robbery.

Someone, however, must advance at least a few observations in empathy for the beleaguered Salt Lake City taxpayer, who has a legitimate, economic, and perhaps, also self-interest in this quixotic drama.

Neither Tribe nor Christiansen, so-called plaintiffs, showed any such empathy for the group that each professed to represent. Neither testified. Tribe is said to be a property owner *in* the so-called "blighted"

---

[1]. Counsel for Tribe and Christiansen, even, in his opening statement said "These are bonds of a particular type, *and they are somewhat unique to Utah jurisprudence.* This is the type of bond that, to my knowledge, is the first time this particular type of bond has been authorized."

area,[2] and Christiansen is an owner *out* of the "blighted" area which the record fails to reflect really is or was "blighted" save for a small segment. Their role as litigants suggests a false universality of representation in this litigation. Neither is mentioned again in this action, in the pleadings, or testimonially, and neither represents me nor thousands of other Salt Lake City taxpayers, and there is not a smidgeon of evidence presented by either of these obvious "convenience" litigants, probative of their protestations that:

> By issuing and selling the Redevelopment Agency Bonds the good name, reputation, financial standing and credit rating of the City will be injured and damaged causing the City to pay increased costs on all of its future obligations. The plaintiffs and the taxpayers will be required to pay increased taxes or suffer a decrease in municipal services because tax monies will be diverted and paid to the Redevelopment Agency instead of into the general fund of the City. For these and for the other reasons stated in the preceding paragraphs the plaintiffs will suffer immediate and irreparable injury and damage for which plaintiffs have no plain, speedy or adequate remedy at law.

*It so happens that, in my opinion, these mythical litigants were dead right in the foregoing statement, but dead wrong in their sincerity* in pressing it or in any wholehearted way trying to prove it.

Having disagreed with my confreres in this case, the payers of the tax tithes are entitled to know some of the facts and legal principles that should have been brought out, but which I think deliberately were Watergated and not emphasized here with respect to the legislation. I think that if the people really had been aware of the legislation okayed by this court and had had an opportunity to vote on it, they would have defeated it by the same thumping majority of two to one when in August 1974, a project then included and now being sponsored by a number of interests is being pressed for funding under this very legislation which evades the right of suffrage.

Way back in July of 1969, Chapter 5, Laws of Utah 1969, was passed, at a *Special Session*,[3]—that started this litigation, —disarmingly called the *"Neighborhood* Development Program." Everyone likes to develop the *Neighborhood* which means homes, nice streets, a church and, if possible, maybe a playground or a hopscotch area, rather than the instant money-inspired non-Neighborhood, but commercial program for high rise hotels, banks, shoe stores, parking meters and parking lots, convenient for Sheraton, Continental Bank, Valley Bank, Zions Bank, Walker Bank, the Kearns Building, et al. One may call 20 acres of commerciality a Neighborhood if he chooses, when it is the choice of lobbyists who wrote the law, the special interests promoting the legislation, the legislators who fell for such fancy, phoney phraseology, city commissioners who committed the same sin and some courts, including, in my opinion, this one. The whole thing, however, is but a snare and a delusion. The legislature should have amended the Title to "The Commercial Encouragement Taxpayer Funded Complex." The word "Neighborhood" is the "blight" in this case,—not its virtue or description.

2. Which includes such institutions as the Continental Bank, Zions First National Bank, Valley Bank & Trust, Ten Broadway Building, Kearns Building, Arrow Press Square Buildings, Capitol Theatre, Bennett Glass and Paint Building, Dinwoodeys, all of which are bounded by the Salt Palace, Zions Savings Bank, the new Main Street Beauty construction, Walker Bank, Tracy-Collins Trust, Prudential Federal, and others.

3. I think that nearly everyone concedes that when you want legislation passed that may be controversial, you introduce it in a *Special*, not a *General Session* to get it launched, and get it passed on the last day,—and call it by an appetizing name, such as "Neighborhood" something or other, or "Children's Aid Program" which may be called "CAP."

In Chapter 5, some unorthodox features are emphasized,—which are as American as apple pie filled with cherries.

Tightly wedged in a melange of trivia, it says that the city commissioners would act as such for municipal purposes, then swivel their chairs around and become real estate brokers, using taxpayers' money to buy and sell property.

Furthermore, in Section 9 of Chapter 5, Laws of Utah 1969, specifically it is said that "A project area *must be restricted* to buildings, improvements or lands *that* are *detrimental* or *inimical* to the *public health,* safety or welfare. Both plaintiffs and defendants quite quietly ignored this simple, understandable interdiction. The subjoined sketch,[4] which was introduced by Tribe and Christiansen, no less,—the *protesters* and *plaintiffs,* professed injured taxpayers, *is obviously* objectionable on a probative value basis and intended according to the testimony, to show some kind of "blight," —and,—no one objected to it. It clearly seems to illustrate, however, that at best and in truth, any "blight" in this 20-acre area amounts at best and very questionably to not more than 20 or 25% of the area, and that hence this project is not responsive to the statutory interdiction that it must be restricted to the blight area,—and not to an extended and additional 75 or 80% of unblighted, but commercial "going concern" property which obviously is going to be almost exclusively benefited.

Without contradiction, Mr. Wall, the Executive Director of the Redevelopment Agency, indulged in a little sworn testimony double-talk, when, at one juncture he said all parking would be available to the general public and later on, with equal conviction said that Continental Bank, the Main Street parking facility, Valley Bank and Sheraton Hotel each *had been assured*

of so many parking places. Presumably, the same assurance would be given to others who bought land from the Agency for commercial purposes.

The first step in this momentous legislation was passed at a *special session* that commenced on May 5, 1969. *It was passed on the very day the session adjourned sine die, without, as I recall,* any such exposure and editorial approval as has been evidenced here, after the decision of this court approving it was announced.

In 1970, the legislature in Chapter 5, in a *Budget Session,* no less,—which generally hides everything with figures, added another cog in the continuing legislative machinery that seemed to be innocuous, but was not. It was enamored by the Title: "Funds for Development Agencies,"—an apparent high commendable bit of legislation, which proved to be but a supplement to the previous legislation, quietly giving the Redevelopment Agency the *power to borrow money* for development of a kidless, homeless, teeter-totterless, churchless, lawnless, macadamized parking lot, not "neighborhood" at all, for no other purpose than to accommodate not kids, etc., but an assortment of banks, the Sheraton Hotel and other private enterprise, like stores selling pants for big men and X-rated movies for little men. The taxpayers were ignored in this Budget Session, when the legislature convened on January 12, 1970, passed the act on January 31, 1970, and adjourned on January 31, 1970,—*same day* (or night), while all good taxpayers were abed. The act Titled "Funds for Development Agencies" consisted of one paragraph suggesting a most wholesome thought, since everyone likes "development,"—but its title belied its purpose. An almost overlooked, neglected, hardly publicized joker in it said "Each Community by *en-*

---

4. Plaintiffs' Exh. 7, on which this author has taken the liberty to blacken the claimed "blighted" areas and crosshatched the claimed "substandard" areas,—which Exhibit was objected to by no one, was not subject to

any foundation to establish admissibility, and was in no way tested for authenticity or authorship in this $15,000,000 tax allocation and where the Redevelopment Agency's name at the bottom suggests some kind of self-interest.

**510**

actment of the legislative body may desig-
nate the legislative body (the City Commis-
sion) as the redevelopment agency of such
community" to transact everything!!!

The next step in this legislative marathon, in order to justify what has happened in this case, was another act authorizing *bonding* for parking, etc., but without authority to use taxes. This act for bonding would require consent of the citizens. This of itself would be innocent and legitimate. It also was passed in the rush of the very day the legislature adjourned.

The next act, *and the payoff,* of course, just had to be one to tag and allocate taxpayers' money for development of the "Neighborhood" commercial promotion, without taxpayer consent, slighting by silence, that precious right of suffrage I assumed we had, but now have relinquished in this unfortunate decision.

The act was Chapter 4, Laws of Utah 1974,—(another Budget Session),—where fiscal matters are the prime targets,—not highly controversial constitutional matters slipped in from the basement. This act was passed in a session convened on January 14, 1974, adjourning February 2, 1974, on which this legislation was railroaded through again on *the same day* the legislature adjourned, in the tradition of The Great Train Robbery.

So much for the legislation. Now about the testimony and transcript of the record challenging the validity of the legislature. The complaint here was filed in August 1974, which set up all the objections that a good municipal bond firm of attorneys could muster to set up straw men to be gunned down not only by their creators, but by the creators' adversaries, as was the case here.

In my opinion both the protesters and their declaratory judgment foes were of one mind, and there appeared to be not even a David in the crowd to take on the Goliath.

The following chronology is baffling: Tribe and Christiansen either lent or sold their names to someone or anybody, as litigants, since they are conspicuous by absence. They were named in the complaint's caption, and on its first page were taxpayers claiming to represent *all* taxpayers from almost everywhere. They promptly performed the greatest disappearing act since Houdini lost his sawed-in-half woman. They were replaced by two witnesses, one of whom was a Mr. Wall, —an import from an Urban Renewal Agency of Fargo, North Dakota,—and guess who: The Executive Director of the Redevelopment Agency. Presumably, at least, partially he must have been friendly to the so-called tax increment bit and the parking meters complex, which was responsible for his salary. Nonetheless, he was called, *not as a hostile* witness but as a *witness for the plaintiff dissidents.* The second witness, this time *for the defendants,* was none other than a Salt Lake City Commissioner who had voted to create the Redevelopment Agency, and himself as one of its committee, and Chairman thereof. His testimony was unrestrained praise for the program. Thus, the only two witnesses called to testify in this whole case were 1) the Executive Director and 2) the Chairman of the Redevelopment area,—none others. In my experience, this is one of the rare cases in Utah's judicial history where not only the law virtually was ignored, but where the adversaries each called but one witness, which in combination in complete harmony and agreement had everything nice to say about the new law,—nothing derogatory,—and where neither one was subjected to cross-examination, and where counsel for both sides never once in 72 pages of testimony objected to any testimony of each other's witness. That is why this case palpably should have been thrown out of court for lack of legitimate justiciable confrontation or that it did not represent an adversary proceeding but was fraught with lack of taxpayer representation, and highlighted by rubber spears in this flaccid combat. We have condemned such cases before, as is reflected in the language of *Backman v. Salt Lake County,* 13 Utah 2d 412, 375 P.2d 756 (1962), and its citations having to do with the Declaratory Judgment Act, as not

being a vehicle for adversary opinions, nor one to furnish insurance policies against or resolve doubts created in the minds of those creating them:

■ We believe also that there was no such justiciable controversy for reasons stated in *Lyon v. Bateman,* particularly that portion of the case requiring that "the interests of the parties must be adverse." The plaintiff pleaded that he and other taxpayers would suffer by needless expenditure of tax money if an election were held, which proved to be constitutionally abortive. At the hearing before this court, counsel for plaintiff commendably and candidly conceded that this action was instituted out of justifiable concern and at the request of a firm of eastern attorneys. Just as candidly, the plaintiff conceded that upholding the constitutionality of the act by this court was hoped for and desired.

■ We cannot see how there could be a true adversary proceeding under such circumstances. That is not to say that in a proper proceeding other than the type here, at which evidence might be adduced and findings made, the matter would be incontestible,—but simply that the Declaratory Judgments Act is not designed for giving advisory opinions in a non-adversary action, or to insure against feared risks. We reaffirm the language of *Lyon v. Bateman,* where we said:

"While the statutes authorizing courts to render declaratory relief should be liberally construed in order to provide prompt settlements of controversies and to stabilize uncertain legal relations, courts, nevertheless, must operate within the constitutional and statutory powers and duties imposed upon them. They are not supposed to be a forum for hearing academic contentions or rendering advisory opinions. In order to maintain an action for declaratory relief, plaintiffs must show that the justiciable and

jurisdictional elements requisite in ordinary actions are present, and a judgment can be rendered only in a real controversy between adverse parties. Generally, courts have held that the conditions which must exist before a declaratory judgment action can be maintained are: (1) a justiciable controversy; (2) the interests of the parties must be adverse; (3) the party seeking such relief must have a legally protectible interest in the controversy; and (4) the issues between the parties involved must be ripe for judicial determination."

In addition we call attention to our observations in *Merkely v. State Tax Commission* relating to this subject. 11 Utah 2d 336, 358 P.2d 991 (1960).

Mr. Wall, *plaintiffs',* not defendants' witness, made some rather interesting and sometimes startling statements,—not in support of the protestations of Tribe and Christiansen, but highly favorable to defendants,—without any cross-examination whatever, and without counsel for Tribe and Christiansen calling any witness or introducing any evidence to refute him. Concededly he was T and C's willing witness against their own position. Substantially, and quite in derogation of declaratory judgment concepts, he testified as follows:

That respecting the "blight" aspect of this case, (which had to do wth an immense 20-acre, two-block area, loaded with banks, buildings and boutiques), the area consisted of six taverns, one private club of undefined virtue, two parking garages, —obsolete or "blighty" it was claimed, because the turning radius would not accommodate today's longer cars, two gypsy phrenology shops (noted for their inherent temporary and transient occupancy), one small manufacturing company, a cafe asserted to have pigeons upstairs, a print shop, an assay office that produced some chemical odors, one cleaning shop, an adult theatre, two barber shops, a Disabled Veterans Thrift Store, an art gallery, and

some upstair office tenants.[5] (This seems to have been the "blight" in the 20-acre site).

He said the redevelopment program contemplated continued commercial use and some residential "possibilities." [6]

The standard procedure of the Redevelopment Agency, he said, was to contact owners of the "blighty" buildings, get *two* appraisals of the value of their property and amazingly, in his words, said: *"It has been our practice to make our offer the amount of the higher appraisal."*[7] To top such generosity he testified that they then paid "relocation" costs to persons who were automatically the beneficiaries of at least the full value,—or its highest appraisal. After paying the price and relocation costs, the Agency then demolished the property, which must have been a godsend to him or a corporation to which the property was slated for sale.

The costs up to June 30, 1974, for the three prior years, including administrative, legal, planning and relocation, including $305,623 interest for borrowed money, was $1,152,563,—which if Tribe and Christiansen knew or should have known, should have enervated them, if they were concerned taxpayers, seriously to have considered suicide or dismay. The procedure after all of the above, he said, was to dispose of the property in order to: Establish priorities, advertise, and receive proposals from developers. One *priority* was a *convention hotel* to complement the Salt Palace[8] or other uses, *"and the necessary parking to support the hotel* and whatever else they (the Agency) would propose. So, *really,* the two keys were parking and the hotel; and we now have signed a contract with Skaggs Drug Corporation . . . agreeing to sell the property to them." Mr. Wall also said:

> "The agency is proposing that the parking facility be built on the basis of a tax increment[9] bond issue *which would be amortized with* the parking revenue after operating and maintenance, and the tax increment that would flow to the Agency on an annual basis."

As to how the Agency proposes to operate the parking facility, he said that no decision has been made yet but the options are 1) to hire their own employees, 2) to lease it. However, the Agency has assured 120 parking spaces for Valley Bank, 175 for Main Parking Mall, 75 for Continental Bank. The testimony of the Executive Director of the Neighborhood Redevelopment Agency, who spoke words with forked tongue, (of doubtful corroboration) parroted the come-on arguments that the development project would produce *vast* increases in assessed valuation (and assumed but not proved, a concomitant increase in taxes going to the taxpayer,—a myth in this case). Such contention seems quite convincingly unconvinceable.

It is intimated that the parking income would pay for the development, supplemented, as might be implied, just a wee bit ·by "allocated" taxpayers' funds. The reverse is true. Tribe and Christiansen's *own* Exhibit No. 14 shows that estimated

---

5. Which were infinitesimally small compared to the rest of the area, and which, if "blighty" or "nuisancy," could have been removed or suppressed by the City, by ordinance and any of one or more available remedies, with greater dispatch, with a court procedure and about one week's employment of a bulldozer and ball in a week or so, as compared with the three or four-year R.A. so-called "Neighborhood Redevelopment" program that slithered through three or four legislatures' comatose scenarios.

6. There is nothing in the record to reflect this, except the Sheraton complex for transients.

7. A generous use of erstwhile taxpayers funds.

8. Which may or may not be considered a "neighborly" gesture.

9. A concurring opinion suggested the increment was "evaluation" increment rather than "tax" increment. The news media advertised this suggestion. It is obviously a more palatable word, but never used in the statute. It has no application, since "evaluation" may go down while the "tax" may go up. The "tax,"—but not the "evaluation" increment is based on the mill levy.

revenues from "Parking," over a ten-year period commencing this year would average not more than $500,000 per year. The taxpayers' money pledged to the "Neighborhood" is $15,000,000, and the bonds creating that sum bear 7% interest, which represents, over and above the $15,000,000 debt of the taxpayers an annual $1,000,000 debt *for interest alone,* the outgo of which is twice as much as the input from the parking .facility. This seems to be a pediculous way to retire the bonds. The Great Train Robbery makes much better mathematical fiscal sense because there the passengers did not have to pay compound interest on the larcenous loot.

The only other witness called in this case, as stated above, was one called by the defendants,—the Chairman of the Neighborhood Rehabilitation Agency, who also was the City Commissioner, and voted for the Agency, and himself as member of the Agency. This circumstance unseemingly but correctly established some kind of precedent and departure in political philosophy by enabling a voted-in official, chosen by the electorate, to vote *as* such voted-in official for another voted-in official of a redevelopment agency,—namely, himself. His testimony was somewhat parallel to, but slightly more guarded, more laudatory, and much briefer, in favor of the legislation. In the shortest cross-examination I have heard about in a $15,000,000 taxpayers' suit with a few other millions adjunct thereto dedicated to a dedicated bureaucracy, counsel for Tribe and Christiansen, lethargic protestants here, asked: "Commissioner, there will be some benefit to the private owners of property in the area, will there not?" and he said "Yes," and that's about all! That exposed the whole plan.

And that's all there is to this case,—a veritable surrender of the requirement of a justiciable controversy for the determination of adversary rights.

I think most of the original points made by plaintiffs, Tribe and Christiansen, were well taken, but they were ignored by their sponsors, simply to arrive at a desired result.

To say, as a Salt Lake City taxpayer, that the decision in this case is legally or morally sound, would be to immoralize and circumvent constitutional language, our American heritage, and freedom of pressure from affluence, and contrariwise would immortalize afearment of politics, pressures and back-door, unregistered, unseen lobbyism disguised as respectability, stemming even from the executive branch of the government and other cultural and commercial segments of the community.

This case is quite disturbing since, in my opinion, at least, it places a stamp of approval not only on a rather sneaky, disguised legislative process and a stalking attack on constitutional concepts, resulting in their destruction. It also approves a trumped-up lawsuit where the plaintiff is the hunter that kills his victim,—that already has been rendered unconscious in the hunter's illegitimate but well-oiled well-placed trap,—all logistically maneuvered while the game wardens (representing the electorate) have been lured into a peaceful valley of temporary contendment, unawareness and inattention. Under the anesthetic of this case, the taxpayers no longer have referendum control over the decisions of municipal bodies to expend money for capital improvements in any area which arbitrarily is *labeled* "blighted," whether it is blighted or not.

The area involved here was *not* blighted, but was prime property, obviously attractive to private risk capital,—more so than were the cases when the Hilton, Howard Johnson, Royal Inn, Arrow Press Square, Utah Hotel addition, complexes all adjacent to or in close proximity, were constructed with private risk capital free of taxpayer participation. Add to that the Salt Palace proximity, and these two so-called blighted areas obviously are better gambles for such risk capital.

The Redevelopment Agency intends to sell bonds to the tune of $15,000,000 to provide "parking." Not only will the park-

ing revenues not even come close to repaying the bonds, but it is highly questionable whether adding the increased tax revenue can accomplish the feat, *especially after deduction of the costs of increased services in the area,* such as police and fire protection, maintenance, health accommodation, etc. If the whole project goes plop, the taxpayer is the ultimate surety. In the meantime the taxpayer has lost the benefit of the increased taxes which the development would pay because those taxes are going instead to pay off bonds on improvements the public did not have to finance to attract the development in the first place, and, what is more important, *certainly did not have the opportunity* to cast its ballot.

What about the remaining blocks the City proposes to redevelop, $15,000,000 here is just the beginning. There are at least 12 more blocks proposed for redevelopment under this program.

While a Center for the Performing Arts' complex *may* be sorely needed in Salt Lake City, nonetheless, by a two-to-one margin, the voters in 1974 turned down a bond referendum which included such a project. It is now being proposed again, under the decision of this case. However, with this new technique, hereby ratified by this court, the City fathers can avoid the voters, and move directly to bonding, just by building it in a "blighted" area. If the definition of "blight" is no tighter than that used in the instant case, it would apply almost anywhere to most of the blocks in Salt Lake City. It may be that, *given the opportunity,* the voters would approve such a project, if it were presented to them in isolation, without the other items included in the 1974 referendum. This would be the decent, democratic and constitutional solution, without resort to the subterfuge reflected in the instant case. The system in the present case, however, removes the voters' check against an obligation of which they may not lend their sanction. Powerful interests are now free to inveigh upon politically sensitive and possibly

over-sold public officials to induce the expenditure of public funds in all sorts of development schemes, with no voter control but with voter liability if the developments fail to produce the needed revenues and/or taxes to repay the bonds, whether or not public inducements are *really* needed to stimulate private enterprise investments in the "blighted" areas.

The capstone of the whole process is the opinion of this court that all that preceded was constitutional. The decision affirmed by the court was decided in a case which wasn't really a case—it was a put up job. Now the bonding companies can sell Salt Lake City "tax increment" bonds secure in the knowledge that they have on file a decision which makes it all legal, and secure in the knowledge that even if the tax increment doesn't suffice, the taxpayers are on the hook, anyway.

In a case of this magnitude and taxpayer concern, it seems significant that the plaintiffs here did not even bother timely to file a petition for rehearing, lending at least some substance to the credibility of this dissent.