[Civ. No. 10668.   Third Dist.   May 21, 1963.]

REDEVELOPMENT AGENCY OF THE CITY OF SACRAMENTO et al., Petitioners, v. MIKE MALAKI, as Chairman of County Board of Supervisors, etc., et al., Respondents.

Everett M. Glenn, City Attorney, Joseph E. Coomes, Jr., and McDonough, Holland, Schwartz, Allen & Wahrhaftig for Petitioners.

John Heinrich, County Counsel (Sacramento), and John F. Downey for Respondents.

FRIEDMAN, J.—Mandate to compel the Chairman of the Sacramento County Board of Supervisors to sign a contract with the Redevelopment Agency of the City of Sacramento and the city itself, as directed by a resolution of the board of supervisors.

The proceeding entails interpretation of certain language in article XIII, section 19, of the state Constitution.  The

constitutional provision was adopted in 1952 to permit a new source of financing for urban redevelopment projects. The general objectives of urban development in California were discussed in *Redevelopment Agency* v. *Hayes*, 122 Cal.App.2d 777 [266 P.2d 105] (cert. den. 348 U.S. 897 [75 S.Ct. 214, 99 L.Ed. 705]). Elimination of blighted areas by redevelopment finds its constitutional basis in protection of public health, morals, safety and general welfare. (*Redevelopment Agency* v. *Hayes, supra,* at pp. 800-802.) A beneficial by-product is the upgrading of real estate values, thereby increasing assessed values on public tax rolls and augmenting public tax revenues.

Article XIII, section 19, was designed to permit the pledge of future increases in property tax revenue within redeveloped areas to pay the principal and interest of bonds issued and sold for the purpose of defraying the cost of redevelopment, which in turn would produce such augmented revenues.[1] The constitutional provision declares that property within a redevelopment project, *except publicly owned*

---

[1] As approved by the voters in 1952 the constitutional provision read as follows:

"All property in a redevelopment project established under the Community Redevelopment Law Act as now existing or hereafter amended, except publicly owned property not subject to taxation by reason of such ownership, shall be taxed in proportion to its value as provided in section 1 of this article, and such taxes (the word 'taxes' as used herein shall include, but shall not be limited to, all levies on an ad valorem basis upon land or real property) shall be levied and collected as other taxes are levied and collected by the respective taxing agencies.

"The Legislature may provide that any redevelopment plan may contain a provision that the taxes, if any, so levied upon such taxable property in a redevelopment project each year by or for the benefit of the State of California, any city, county, city and county, district, or other public corporation (hereinafter sometimes called 'taxing agencies') after the effective date of the ordinance approving the redevelopment plan, shall be divided as follows:

"(a) That portion of the taxes which would be produced by the rate upon which the tax is levied each year by or for each of said taxing agencies upon the total sum of the assessed value of the taxable property in the redevelopment project as shown upon the assessment roll used in connection with the taxation of such property by such taxing agency, last equalized prior to the effective date of such ordinance, shall be allocated to, and when collected shall be paid into, the funds of the respective taxing agencies as taxes by or for said taxing agencies on all other property are paid (for the purpose of allocating taxes levied by or for any taxing agency or agencies which did not include the territory in a redevelopment project on the effective date of such ordinance but to which such territory has been annexed or otherwise included after such effective date, the assessment roll of the county last equalized on the effective date of said ordinance shall be used in determining the assessed valuation of the taxable property in the project on said effective date); and

*property not subject to taxation,* shall be subject to ad valorem taxes. After the effective date of an ordinance approving a redevelopment plan, the county, the city and other taxing agencies are to receive that part of the revenue produced by applying current tax rates "upon the total sum of the assessed value of the taxable property in the redevelopment project as shown upon the assessment roll . . . last equalized prior to the effective date of such ordinance. . . ." (The quoted language is the hub around which this litigation revolves.) When augmented property values produce taxes in excess of the amount thus payable to the taxing agencies, then, according to the constitutional provision, the excess is

---

"(b) That portion of said levied taxes each year in excess of such amount shall be allocated to and when collected shall be paid into a special fund of the redevelopment agency to pay the principal of and interest on loans, moneys advanced to, or indebtedness (whether funded, refunded, assumed or otherwise) incurred by such redevelopment agency to finance or refinance, in whole or in part, such redevelopment project. Unless and until the total assessed valuation of the taxable property in a redevelopment project exceeds the total assessed value of the taxable property in such project as shown by the last equalized assessment roll referred to in paragraph designated (a) hereof, all of the taxes levied and collected upon the taxable property in such redevelopment project shall be paid into the funds of the respective taxing agencies. When said loans, advances, and indebtedness, if any, and interest thereon, have been paid, then all moneys thereafter received from taxes upon the taxable property in such redevelopment project shall be paid into the funds of the respective taxing agencies as taxes on all other property are paid.

"The Legislature may also provide that in any redevelopment plan or in the proceedings for the advance of moneys, or making of loans, or the incurring of any indebtedness (whether funded, refunded, assumed or otherwise) by the redevelopment agency to finance or refinance, in whole or in part, the redevelopment project, the portion of taxes mentioned in paragraph designated (b) hereof may be irrevocably pledged for the payment of the principal of and interest on said loans, advances, or indebtedness.

"It is intended by this section to empower any redevelopment agency, city, county, or city and county under any law authorized by this section to exercise the provisions hereof separately or in combination with powers granted by the same or any other law relative to redevelopment agencies. This section shall not affect any other law or laws relating to the same or a similar subject but is intended to authorize an alternative method of procedure governing the subject to which it refers.

"All of the provisions of the Community Redevelopment Law, as amended in 1951, which relate to the use or pledge of taxes or portions thereof as herein provided, or which, if effective, would carry out the provisions of this section or any part thereof, are hereby approved, legalized, ratified and validated and made fully and completely effective and operative upon the effective date of this amendment.

"The Legislature shall enact such laws as may be necessary to enforce the provisions of this section." (Cal. Const., art. XIII, § 19, as adopted in 1952.)

A later (1962) amendment eliminated the next to last paragraph of the quoted provision as no longer necessary.

to be allocated to a special fund of the redevelopment agency to pay principal and interest of bonds. Advance pledge of the excess tax revenue as bond security is permitted. After the bond obligation is paid off, the separate allocation of excess revenue ceases, and all the tax income goes to the taxing agencies. Provisions of the Community Redevelopment Law (specifically, Health & Saf. Code, §§ 33950-33954) supply implementing details.

█ The convenient label "tax allocation bonds" is applied to redevelopment bond issues resting on the security of such excess tax revenue.

On June 16, 1960, the Sacramento City Council adopted an ordinance approving a redevelopment plan for a 10¼-block area in the western part of downtown Sacramento, designating it as Capitol Mall Extension, Project No. 3. The ordinance was immediately effective. At that time the "last equalized" assessment rolls used by the various public agencies levying property taxes were those for the 1959-1960 fiscal year. (Rev. & Tax. Code, §§ 1603, 1614; *Bryant* v. *Board of Supervisors of Orange County*, 32 Cal.App. 495 [163 P. 341].) Almost a year after approval of Project No. 3, the State Highway Commission established a route for a north-south freeway paralleling the Sacramento River. The freeway right-of-way will occupy four of the 10¼ blocks within Redevelopment Project No. 3. At the time the State Highway Commission acted, the redevelopment agency was in the process of acquiring land in the 4-block freeway path. It has now acquired 75 per cent of the 4 blocks and has entered into an agreement with the State Department of Public Works to acquire the remainder and to sell the 4-block area to the department for highway purposes. When that event occurs, the four blocks will be exempt from taxation as state-owned highway property. (Cal. Const., art. XIII, § 1.) Thus the 4-block freeway area will provide no tax revenue either for local taxing agencies or for redevelopment bond servicing.

According to the plan for Project No. 3, as approved by the city council, part of the project cost will be raised by an issue of tax allocation bonds. In view of the fact that the 4 blocks of freeway will produce no property taxes, the redevelopment agency has prepared an agreement declaring that the 4 blocks will not be included in the assessment rolls used as the base for computing allocations of future tax income between the public taxing agencies, on the one hand, and payment of the tax allocation bonds, on the other. Proposed

parties to the agreement are the County of Sacramento and City of Sacramento, as the taxing agencies whose assessment rolls form the basis of tax levies in the area, and the redevelopment agency. The latter two entities have executed the agreement. The county board of supervisors has approved the agreement and directed its chairman to sign it on behalf of the county. Respondent Malaki, the chairman, refuses to sign, declaring that conformity of the agreement with article XIII, section 19 of the state Constitution is doubtful. The redevelopment agency seeks a writ directing Malaki to sign. Other respondents are the other public districts which levy property taxes within the redevelopment area.

Respondents argue in substance: Although the 4-block area to be acquired by the state will be tax exempt and will not produce tax revenue, it was all in private ownership in 1959 and thus appears on the ''assessment roll . . . last equalized'' prior to approval of the redevelopment project; a literal reading of article XIII, section 19, unalterably pegs future tax revenue payable to respondents at an amount equal to that to be produced by the total of all assessed values in the project area as shown on the 1959-1960 rolls, including the assessed value of the 4 blocks in the freeway path; acquisition of the 4 blocks by a tax-exempt public entity does not alter the palpable presence of these 4 blocks as taxable property on the 1959-1960 assessment rolls.

Petitioner rejects such a literal reading of the constitutional language. The substance of petitioner's argument is this: If the 1959-1960 assessed valuation of the 4-block freeway route remains as part of the base for allocation of tax income, the taxing agencies will receive all the tax income produced by the remaining 6 blocks, until such time as the 6 blocks generate more taxes than those produced by the entire $10\frac{1}{4}$ blocks as valued in 1959-1960; unless and until that point is reached, there will be no excess tax revenue available for servicing tax allocation bonds of the redevelopment agency; proper interpretation of article XIII, section 19, requires that property which becomes tax exempt by reason of public acquisition occurring after approval of a redevelopment project must be deducted from the ''last equalized'' assessment rolls which provide the base for allocation of income between the taxing agencies and tax allocation bonds; such an interpretation would spread the tax loss among all recipients; the opposite interpretation would confer a windfall on the county, the city and other taxing agencies by im-

munizing them from the tax loss otherwise caused by public acquisitions. In support of this argument, petitioner cites 35 Ops. Cal. Atty. Gen. 211, in which the Attorney General expressed this view of section 19: "The more reasonable conclusion, however, is that the taxing agencies should receive only the amount of taxes which they would have received had there been no redevelopment project and that this amount is to be computed by applying the current rate to the total sum of the assessed value of the remaining taxable property on the base roll. In other words, the 'total sum of the assessed value of the taxable property' must be redetermined whenever any parcel of property ceases to be 'taxable property.' "

▮▮ Aside from the problems of phraseology, the general objective of article XIII, section 19, is apparent. As stated in the argument to the voters printed in the Secretary of State's 1952 ballot pamphlet: "It will make possible the passage of laws providing that tax revenues derived from any increase in the assessed value of property within a redevelopment area because of new improvements, shall be placed in a fund to defray all or part of the cost of the redevelopment project that would otherwise have to be advanced from public funds." Thus the profit from increased valuations is to be available for bonding purposes. The objective is to make interim tax profits available for bonds and to defer the profits of general government until the bonds are paid.

While clarity is usually praised as the *summum bonum* of statutory draftsmanship, it may not be amiss to extol the virtues of prescience. Quite apparently the present contingency was not foreseen by the draftsmen of section 19. To be sure, the creation of tax exemptions through public acquisition was recognized. Nevertheless, in referring to the "last equalized" assessment rolls, the draftsmen overlooked the fact that these rolls are physical, tangible documents on which properties are immutably inscribed, even though some of these properties might someday pass into public ownership and hence provide no tax revenue. We say they "overlooked" the fact. The statement is not a bootstrap argument. It is based on recognition of the objectives described above.

▮▮ At this point we reach the interpretive process. Basic interpretive doctrine bids us to seek and follow the intent of the lawmakers. (*Select Base Materials* v. *Board of Equalization,* 51 Cal.2d 640, 645 [335 P.2d 672]; 45 Cal.Jur.2d,

Statutes, § 126, pp. 634-635; Sutherland, Statutory Construction (3d ed. 1943) § 4501, pp. 314-316.) ▮ Many authorities term the search illusive when, as here, the lawmakers did not foresee the existing contingency; when, if they had an intent on the point presented, they would have expressed it. (Curtis, *A Better Theory of Legal Interpretation* (1950) 3 Vanderbilt L.Rev. 407-437; Gray, The Nature and Sources of the Law (2d ed. 1924) pp. 124-125, 171-172; see Patterson, Jurisprudence: Men and Ideas of the Law (1953), pp. 198-204.) As is well known, canons of interpretation are available to reach and justify variant results. (See Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are To Be Construed* (1950) 3 Vanderbilt L.Rev. 395 at pp. 401-406.) Flexibility is especially available and the opportunities for judicial legislation multiply when, as here, there is a paucity of extrinsic legislative material. Willy-nilly, courts sometimes find themselves in the position described by Bishop Benjamin Hoadly in 1717: "Nay, whoever hath an absolute authority to interpret any written or spoken laws, it is he who is truly the Law-giver to all intents and purposes, and not the person who first wrote or spoke them." (Quoted in Gray, *op. cit.*, pp. 102, 125.)

This seeming opportunity for free interpretation should generate restraint. As the late Learned Hand pointed out, it is vital that legislative enactments be "loyally enforced" according to the judges' understanding of the "real accord." (Dilliard, The Spirit of Liberty (1952) pp. 173-174, quoted in Mendelson, *Mr. Justice Frankfurter on the Construction of Statutes* (1955) 43 Cal.L.Rev. 652 at p. 654.) ▮ If legislative intent on the specific point is a will-o'-the-wisp, a decisional norm is not lacking. The general objective of the provision is a prime consideration; it is to be construed with a view to promoting rather than defeating its general purpose. (See cases collected 14 Cal.Jur.2d, Statutes, §§ 122, 129, pp. 631, 637.) If this were the only criterion we needed, petitioner could have its writ right now. We cannot, however, achieve the lawmakers' objective by closing our eyes to the words they used.

▮ Here we confront the "plain meaning" rule. Statutory language must be given effect according to its usual, ordinary import. (See cases collected 45 Cal.Jur.2d, Statutes, § 140, p. 647.) Interpretation is not permissible where the language is clear and unambiguous; in such cases the courts

are to give the language its plain meaning, even if it appears probable that the lawmaking body had a different objective. (45 Cal.Jur.2d, Statutes, §§ 108, 127, pp. 621, 635.) Construction with reference to statutory purpose and "the evils to be cured thereby" may be defeated by the very language of the statute. (*People* v. *Sciortino,* 175 Cal.App.2d Supp. 905, 909 [345 P.2d 594].) There is no cloudiness about the "last equalized" assessment roll and no murkiness about the tangible property physically listed on the roll.

The "plain meaning" rule rests upon the fallacy that so-called clear and unambiguous words have independent existence and meaning. (See 2 Sutherland, *op. cit.,* § 4502, pp. 316, 317; § 4504, pp. 319-320.) Words take color from their context, and language of fairly certain significance becomes equivocal in relation to its surroundings. Sometimes plain meaning disappears in the reflected light of the provision's objectives and policy. (Patterson, *op. cit.,* p. 204.) The fact is that section 19 of article XIII possesses verbal and structural possibilities resulting in ambiguity which beclouds the superficially clear language in issue.

The first paragraph of section 19 expressly declares the tax-exempt status of publicly owned property within a redevelopment project. The clause is utterly superfluous to create an exemption, because the exempt status of publicly owned property generally, within and without redevelopment projects, has been fixed by article XIII, section 1, of the Constitution. Hence the clause has some other purpose. It has some connection with the references to *taxable* property in subdivisions (a) and (b), particularly as part of the phrase "total sum of the assessed value of the taxable property . . . as shown upon the assessment roll . . . last equalized. . . ." In terms of a description of property physically inscribed on a physical assessment roll, the adjective "taxable" is most inappropriate. As a matter of law, assessment rolls do not show publicly owned property.[2] They include only that property which the tax assessor has the duty of assessing, and he has no duty to assess publicly owned property. (Rev. & Tax. Code, §§ 401, 601, 602, subd. (k); see *General Dynamics Corp.* v. *County of Los Angeles,* 51 Cal.2d 59, 65 [330 P.2d 794].) The phrase "assessment roll . . . last equalized" re-

---

[2]As a matter of administrative convenience some assessors may place publicly owned parcels on the roll or on an addendum to the roll. We are speaking here of the assessment roll as contemplated by the statutes which direct its formulation and as contemplated by a constitutional provision framed in the light of those statutes.

fers to a static set of values inscribed on a physical document and to be used for valuation on a parcel-by-parcel basis. "Taxable," on the other hand, is descriptive of a fluid legal status and has no temporal import, perhaps describing status at any time, that is, whenever taxes are being assessed and collected. Arguably, a change in status which removes property from the taxable category, would remove its assessed value, or former assessed value, from the tax base used for allocation.[3] However inarticulately, these provisions would signify a change in the tax allocation base following public acquisitions.

Alternative syntactical possibilities supply another source of ambiguity in this superficially "clear" provision. The focal description point of subdivision (a) is the phrase "total sum of the assessed value of the taxable property." The clause "as shown upon the assessment roll . . . last equalized" modifies some part of this phrase. But which part? If it modifies "taxable property," the so called literal or fixed interpretation is fortified. The "taxable property" phrase is itself only a modification. If:

(a) "of the taxable property" and

(b) "as shown upon the assessment roll . . . last equalized" are concurrent and independent descriptions of the phrase "assessed value," then a different meaning emerges. "Total sum of the assessed value" then becomes a product of two modifying concepts: (a) taxability as a fluid status, and (b) the physical concept of the individual parcel valuations inscribed on the tangible assessment document.

A third source of doubtful meaning stems from the second sentence of subdivision (b), which reads: "Unless and until the total assessed valuation of the taxable property in a redevelopment project exceeds the total assessed value of the taxable property in such project as shown by the last equalized assessment roll referred to in paragraph designated (a) hereof, all of the taxes levied and collected upon the taxable property in such redevelopment project shall be paid into the funds of the respective taxing agencies."

Note that the word "taxable" occurs three times in this one sentence. The first and third occurrences deal with the future, that is, whenever taxes are being assessed and collected. So used, "taxable" is not fixed in time and expresses a shift-

---

[3]We are concerned only with exemptions created by public ownership. No implications are to be drawn on the subject of other kinds of property tax exemption in the light of article XIII, section 19.

ing legal status. On its second appearance, the word seems to characterize property physically inscribed on the last equalized assessment roll. Here it has a past, static connotation. This connotation collides with its apparent meaning in its other appearance. No matter which alternative should yield, the conflict demonstrates ambiguity.

■ Convinced of the real ambiguity of this constitutional provision, we are at liberty to interpret it in such manner as to accomplish, rather than frustrate, its objective. (*Wotton* v. *Bush,* 41 Cal.2d 460, 467 [261 P.2d 256]; *Rock Creek Water District* v. *County of Calaveras,* 29 Cal.2d 7, 9 [172 P.2d 863]; 45 Cal.Jur.2d, Statutes, § 129, p. 637.) ■ The objective is to make augmented property values the source of new tax revenue to be used for servicing tax allocation bonds; to facilitate redevelopment by facilitating the bonds and not to present general government with a tax windfall by immunizing it against the loss occasioned by public acquisitions. The word "taxable," then as it appears in subdivisions (a) and (b) of article XIII, section 19, is aimed at future exclusion of publicly owned property; thus the total assessed value shown upon the assessment rolls last equalized before the effective date of redevelopment approval is to be diminished, from time to time, by the assessed values, as shown upon those rolls, of any properties acquired by tax-exempt public entities.

The proposed agreement among the county, city and redevelopment agency does not conflict with article XIII, section 19, of the state Constitution, and respondent Malaki has the duty of signing it as directed by the board of supervisors.

Let a peremptory writ of mandate issue as prayed.

Pierce, P. J., and Janes, J. pro tem.,* concurred.

---

*Assigned by Chairman of Judicial Council.