[Civ. No. 25933.   First Dist., Div. Two.   Oct. 31, 1968.]

REDEVELOPMENT AGENCY OF THE CITY AND COUNTY OF SAN FRANCISCO, Petitioner, v. NATHAN B. COOPER, as Controller, etc., et al., Respondents.

Henry F. Davis, George Herrington, William H. Orrick, Jr., Richard C. Salladin, Willoughby C. Johnson and Orrick, Herrington, Rowley & Sutcliffe for Petitioner.

Horace A. Weller, Peter Hunt and Burd, Hunt & Friedman for Respondents.

AGEE, J. — Petition for mandate by Redevelopment Agency of the City and County of San Francisco, a public corporation (hereafter ''Agency'') to compel respondent Kaplan, chairman of the Agency, and respondent Cooper, as Controller of said city and county, to perform certain acts in connection with the execution and issuance of tax allocation bonds by the Agency.

In April 1959 the Agency adopted a plan for the redevelopment of the ''Embarcadero-Lower Market Approved Redevelopment Project Area E-1'' (hereafter ''project area''). On May 25, 1959 the Board of Supervisors of the City and County of San Francisco (hereafter ''Board'') approved this plan by duly enacting on said date Ordinance No. 301-59.

The Agency acquired the project area with the proceeds of a temporary project loan of $18,119,105 from the federal government. This loan was to be paid off with a federal capital grant of $5,549,836 and the balance with proceeds from the disposition of project land. The original redevelopment plan did not contain any provision for the type of financing sought herein. The Agency refrained from amending the original plan to include allocation financing until the need for it arose.

The Agency has now determined that it is necessary for the further development of the project area that it be directly linked with the transit system now being constructed by the San Francisco Bay Area Rapid Transit District, commonly known as ''BART.''

The Agency has also determined that the most feasible and economic way to accomplish this objective is to construct a subway station at or near Market Street and Davis Street and connect it with the tunnel or tube now being constructed by BART beneath the surface of Market Street.

The value to the project area of such an improvement is readily apparent. BART has publicly stated that it is financially unable to construct such a facility and does not plan to do so.

On July 15. 1968 the Agency approved an amendment to the original redevelopment plan, in order to obtain funds with

which to construct the aforesaid station and connecting facilities. On July 22, 1968 the Board approved this amendment and duly enacted Ordinance No. 204-68, which provides for and authorizes the issuance of tax allocation bonds in accordance with section 19 of article XIII of the California Constitution and sections 33670-33674 of the Health and Safety Code.

On July 23, 1968, the Agency adopted a resolution authorizing the immediate issuance of $15,000,000 principal amount of bonds, series of 1968. The proceeds of said bonds are to be used by the Agency to construct said station and connecting facilities.

Each owner of land in the project area has consented in writing to the amendment to the plan as approved by Ordinance No. 204-68.

The bonds, when issued, will be secured by a special fund of the Agency to be created pursuant to Health and Safety Code section 33670. This fund will be comprised of allocations from the taxes which are levied annually by taxing agencies within the City and County of San Francisco upon the taxable properties within the project area. No increase in such taxes is involved. Only the allocation thereof is affected.

Section 19 of article XIII of the California Constitution was adopted in 1952 to permit a new source of financing for urban redevelopment agencies. It provides in part as follows:

"All [taxable] property in a redevelopment project established under the Community Redevelopment Law Act [now Health & Saf. Code §§ 33000-33674] . . . shall be taxed in proportion to its value . . . , and such taxes . . . shall be levied and collected as other taxes are levied and collected by the respective taxing agencies.

"The Legislature may provide that any redevelopment plan may contain a provision that the taxes, if any, so levied upon such taxable property in a redevelopment project each year . . . shall be *divided* as follows:

"(a) That *portion* of the taxes which would be produced by the rate upon which the tax is levied each year by or for each of said taxing agencies upon the total sum of the assessed value of the taxable property in the redevelopment project as shown upon the assessment roll used in connection with the taxation of such property by such taxing agency, *last equalized prior to the effective date of such ordinance,* shall be allocated to, and when collected shall be paid into, the funds of the respective taxing agencis . . .; and

"(b) That *portion* of said levied taxes each year in *excess*

of such amount shall be allocated to and when collected shall be paid into a *special fund of the redevelopment agency* to pay the principal of and interest on loans, moneys advanced to, or indebtedness (whether funded, refunded, assumed or otherwise) incurred by such redevelopment agency to finance or refinance, in whole or in part, such redevelopment project.'' (Italics added.)

Under this constitutional authorization the Legislature, in 1963, enacted section 33670 of the Health and Safety Code,[1] restating therein all of the above portion of section 19 which follows the words, ''The Legislature may provide that.''

Section 33670 makes no distinction between, and applies equally to, redevelopment plans approved *prior* to its enactment as well as to those approved thereafter.

Sections 33450 and 33670 were enacted by the same statute (Stats. 1963, ch. 1812). Section 33450 provides: ''If at any time after the adoption of a redevelopment plan for a project area by the legislative body, it becomes necessary or desirable to amend or modify such plan, the legislative body may amend such plan upon the recommendation of the agency.''

Therefore, the Agency was not required to and did not present for approval a *new* redevelopment plan. It simply amended the original redevelopment plan by adding thereto the provision permitted by section 33670.

Further indication that the Legislature recognizes a clear-cut distinction between an *amendment* to a redevelopment plan and the plan itself is indicated in the 1967-enacted section 33457, whose opening phrase is: ''After the *amendment* of a redevelopment plan *to add the provision permitted by Section 33670, . . . .*'' (Italics added.)

The amendment of July 22, 1968 (Ordinance No. 204-68) added only two provisions to the redevelopment plan: (1) the inclusion of the proposed subway station within the project area and (2) the financing of the cost of such improvement by the method provided for in sections 33670-33674.

The approval by the Board of this amendment and of four prior minor amendments (Ordinances numbered 208-61, 194-64, 196-64 and 123-67) cannot be considered as the establishment of a new or separate redevelopment plan. The only complete redevelopment plan is that approved by the enactment on May 25, 1959 of Ordinance No. 301-59.

---

[1] All subsequent section references are to the Health and Safety Code unless otherwise indicated.

The taxes which may become subject to allocation and payment to a redevelopment agency are designated in section 33670 as those taxes which are "levied upon taxable property in a redevelopment project each year . . . after the effective date of the ordinance approving the redevelopment plan. . . ." Here, this date is May 25, 1959.

The base valuation to be used in calculating the allocation or division of such taxes is, as provided in section 33670, subdivision (a), "the total sum of the assessed value of the taxable property in the redevelopment project as shown upon the assessment roll . . . last equalized prior to the effective date of such ordinance."

The assessment roll for the fiscal year 1958-59 shows the total assessed value of the subject property to be the sum of $4,746,600. The assessment roll for the fiscal year 1967-68 shows the total assessed value of the *same* property to be the sum of $9,940,265.

This five-million dollar increase in assessed valuation would undoubtedly afford the Agency sufficient tax allocation moneys to service the proposed bond issue if the base period to be used in fixing the "assessed value of the taxable property in the redevelopment project" is that for the 1958-59 fiscal tax year.

We note that section 33674 determines *when* such an allocation and payment may be made for the first time. It provides as follows:

"The portion of taxes mentioned in subdivision (b) of Section 33670 shall not be allocable and payable for the first time *until* the tax year which begins after the January 1st next following the *transmittal* [to certain public officials and entities] of the *documents* as required in Section 33375 or Section 33457." (Italics added.) One of the enumerated "documents" is "a copy of the ordinance amending the plan."

Since the ordinance amending the plan (No. 204-68) was not enacted until July 22, 1968 and a copy thereof could not be transmitted until then, the first taxes which can be allocated to the Agency will be those levied upon the subject property for the tax year 1969-70.

We have concluded that: (1) an existing redevelopment plan may be amended by adding to it the tax allocation provision permitted by section 33670 (§§ 33450, 33457) and that such an amendment does not create a new or separate redevelopment plan; (2) that in the present instance the term "redevelopment plan," as used in section 33670, means and is intended to refer to the *original* redevelopment plan.

We believe that this conclusion is in accord with the legislative intent and with the objectives of the Community Redevelopment Law (§§ 33000-33674).

In *Redevelopment Agency* v. *Malaki* (1963) 216 Cal.App.2d 480 [31 Cal.Rptr. 92], the base assessment roll was that of 1959-60. A portion of the taxable property in the project area was thereafter taken by the Highway Commission for freeway purposes, thus making such portion tax-exempt. The court was called upon to interpret the word "taxable" as used in section 19, article XIII, of the state Constitution.

The holding is as follows: "The word 'taxable,' then as it appears in subdivisions (a) and (b) of article XIII, section 19, is aimed at future exclusion of publicly owned property; thus the total assessed value shown upon the assessment rolls last equalized before the effective date of redevelopment approval is to be diminished, from time to time, by the assessed values, as shown upon those rolls, of any properties acquired by tax-exempt public entities."

The specific issue in *Malaki* is, of course, different from that herein. However, we believe that the following principles and reasoning stated therein are applicable here.

"Elimination of blighted areas by redevelopment finds its constitutional basis in protection of public health, morals, safety and general welfare. [Citation.] A beneficial by-product is the upgrading of real estate values, thereby increasing assessed values on public tax rolls and augmenting public tax revenues.

"Article XIII, section 19, was designed to permit the pledge of future increases in property tax revenue within redeveloped areas to pay the principal and interest of bonds issued and sold for the purpose of defraying the cost of redevelopment, which in turn would produce such augmented revenues. . . .

"When augmented property values produce taxes in excess of the amount thus payable to the taxing agencies, then, according to the constitutional provision, the excess is to be allocated to a special fund of the redevelopment agency to pay principal and interest of bonds. Advance pledge of the excess tax revenue as bond security is permitted. After the bond obligation is paid off, the separate allocation of excess revenue ceases, and all the tax income goes to the taxing agencies. . . .

"Aside from the problems of phraseology, the general objective of article XIII, section 19, is apparent. As stated in

the argument to the voters printed in the Secretary of State's 1952 ballot pamphlet: 'It will make possible the passage of laws providing that tax revenues derived from any increase in the assessed value of property within a redevelopment area because of new improvements, shall be placed in a fund to defray all or part of the cost of the redevelopment project that would otherwise have to be advanced from public funds.' Thus the profit from increased valuations is to be available for bonding purposes. The objective is to make interim tax profits available for bonds and to defer the profits of general government until the bonds are paid.''

''At this point we reach the interpretive process. Basic interpretive doctrine bids us to seek and follow the intent of the lawmakers. [Citations.] . . . The general objective of the provision is a prime consideration; it is to be construed with a view to promoting rather than defeating its general purpose. . . . We cannot, however, achieve the lawmakers' objective by closing our eyes to the words they used. Here we confront the 'plain meaning' rule. . . . The 'plain meaning' rule rests upon the fallacy that so-called clear and unambiguous words have independent existence and meaning. . . . Sometimes [however] plain meaning disappears in the reflected light of the provision's objectives and policy.''

In conclusion, the court found that the word ''taxable'' was sufficiently ambiguous to allow it ''to interpret it in such manner as to accomplish, rather than frustrate, its objective. [Citations.] The objective is to make augmented property values the source of new tax revenue to be used for servicing tax allocation bonds; to facilitate redevelopment by facilitating the bonds and not to present general government with a tax windfall. . . .''

Let a peremptory writ of mandate issue, ordering respondent Cooper, as Controller of the City and County of San Francisco, to establish a special fund of the petitioner, Redevelopment Agency of the City and County of San Francisco, to pay the principal and interest on those certain allocation bonds of said Redevelopment Agency, series of 1968, as specified in resolution adopted by said Redevelopment Agency on July 23, 1968; and

Ordering respondent Kaplan, as chairman of said Redevelopment Agency, to sign and execute said bonds.

Shoemaker, P. J., and Taylor, J., concurred.