[L.A. No. 30827. May 16, 1978.]

REDEVELOPMENT AGENCY OF THE CITY OF SAN
BERNARDINO et al., Plaintiffs and Appellants, v.
COUNTY OF SAN BERNARDINO et al.,
Defendants and Respondents.

256

■■■■■■■■■■■■■
■■■■■■■■■■■■
■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

## COUNSEL

William A. Flory, McDonough, Holland, Schwartz & Allen, William G. Holliman, Jr., and Richard E. Brandt for Plaintiffs and Appellants.

James Warren Beebe and Milton N. Sherman as Amici Curiae on behalf of Plaintiffs and Appellants.

M. Crane Kitchel, County Counsel, Richard Wm. Strong, Deputy County Counsel, and James W. Dilworth for Defendants and Respondents.

## OPINION

**TOBRINER, J.**—The present case raises the problem of the treatment for tax purposes of property located in a redevelopment project which, subsequent to the adoption of the redevelopment plan, is transferred for one reason or another into public ownership. Article XVI, section 16 of the California Constitution provides that the basis for calculating taxation of property located in a redevelopment project shall be "the assessment roll used in connection with the taxation of such property by [the local taxing agencies], last equalized prior to the effective date of [the ordinance adopting the redevelopment plan]."[1] The Constitution also provides that tax revenue collected from property in a redevelopment project may be shared by the local taxing agencies and the redevelopment agency. It is the formula for tax allocation between the taxing agencies and the redevelopment agency which the present case addresses.

---

[1]Article XVI, section 16, provides in pertinent part: "All property in a redevelopment project established under the Community Redevelopment Law Act as now existing or hereafter amended, except publicly owned property not subject to taxation by reason of such ownership, shall be taxed in proportion to its value as provided in Section 1 of

That formula is as follows: "(a) That portion of the taxes which would be produced by the rate upon which the tax is levied each year by . . . [the] taxing agencies upon the *total sum of the assessed value of the taxable property* in the redevelopment project as shown upon the assessment roll used in connection with the taxation of such property by such taxing

[Article XIII], and such taxes (the word 'taxes' as used herein shall include, but shall not be limited to, all levies on an ad valorem basis upon land or real property) shall be levied and collected as other taxes are levied and collected by the respective taxing agencies.

"The Legislature may provide that any redevelopment plan may contain a provision that the taxes, if any, so levied upon such taxable property in a redevelopment project each year by or for the benefit of the State of California, any city, county, city and county, district, or other public corporation (hereinafter sometimes called 'taxing agencies') after the effective date of the ordinance approving the redevelopment plan, shall be divided as follows:

"(a) That portion of the taxes which would be produced by the rate upon which the tax is levied each year by or for each of said taxing agencies upon the *total sum of the assessed value of the taxable property* in the redevelopment project as shown upon the assessment roll used in connection with the taxation of such property by such taxing agency, last equalized prior to the effective date of such ordinance, shall be allocated to, and when collected shall be paid into, the funds of the respective taxing agencies as taxes by or for said taxing agencies on all other property are paid (for the purpose of allocating taxes levied by or for any taxing agency or agencies which did not include the territory in a redevelopment project on the effective date of such ordinance but to which such territory has been annexed or otherwise included after such effective date, the assessment roll of the county last equalized on the effective date of said ordinance shall be used in determining the assessed valuation of the taxable property in the project on said effective date); and

"(b) That portion of said levied taxes each year in excess of such amount shall be allocated to and when collected shall be paid into a special fund of the redevelopment agency to pay the principal of and interest on loans, moneys advanced to, or indebtedness (whether funded, refunded, assumed or otherwise) incurred by such redevelopment agency to finance or refinance, in whole or in part, such redevelopment project. Unless and until the total assessed valuation of the taxable property in a redevelopment project exceeds the total assessed value of the taxable property in such project as shown by the last equalized assessment roll referred to in paragraph designated (a) hereof, all of the taxes levied and collected upon the taxable property in such redevelopment project shall be paid into the funds of the respective taxing agencies. When said loans, advances, and indebtedness, if any, and interest thereon, have been paid, then all moneys thereafter received from taxes upon the taxable property in such redevelopment project shall be paid into the funds of the respective taxing agencies as taxes on all other property are paid.

"The Legislature may also provide that in any redevelopment plan or in the proceedings for the advance of moneys, or making of loans, or the incurring of any indebtedness (whether funded, refunded, assumed or otherwise) by the redevelopment agency to finance or refinance, in whole or in part, the redevelopment project, the portion of taxes mentioned in paragraph designated (b) hereof may be irrevocably pledged for the payment of the principal of and interest on said loans, advances, or indebtedness." (Italics added.)

The provisions of the Community Redevelopment Law, Health and Safety Code sections 33670, 33671, are identical to the portions of article XVI, *supra,* following the words, "The Legislature may provide that."

agenc[ies], last equalized prior to the effective date of such ordinance [adopting the redevelopment plan], shall be allocated to . . . the funds of the respective taxing agencies . . .; and [¶] (b) That portion of said levied taxes each year in excess of such amount shall be allocated to . . . a special fund of the redevelopment agency . . . ." (Italics added.) (Cal. Const., art. XVI, § 16.)

In essence this section provides that if, after a redevelopment project has been approved, the *assessed valuation of taxable property* in the project increases, the taxes levied on such property in the project area are divided between the taxing agency and the redevelopment agency. The taxing agency receives the same amount of money it would have realized under the assessed valuation existing at the time the project was approved, while the additional money resulting from the rise in assessed valuation is placed in a special fund for repayment of indebtedness incurred in financing the project.

This case presents a problem, however, which arises from an ambiguity in the constitutional provisions. As the provisions declare, the "assessed value of the taxable property in the redevelopment project as shown upon the assessment roll" governs the calculation and allocation of tax revenues. Yet the meaning of the phrase "taxable property" is unclear: does the language refer to that property in a redevelopment project which is taxable *each year* at the time taxes are imposed, or do the words refer to that property which *was taxable* at the time the original base assessment roll was prepared? If subsequent to redevelopment the public agency acquires a portion of the formerly taxable property within the redevelopment area, that property attains *tax exempt* status. Taxes then derived from that property are no longer available for division between the redevelopment agency and the taxing agencies. Under those circumstances, how should the taxes received from the balance of the project be divided?

A 1960 opinion of California Attorney General Stanley Mosk elucidates the issue. "To illustrate the problem," he explains, "it is helpful to consider a hypothetical situation. Assume there is an area which is to be redeveloped and that there are four parcels of property in this area, A, B, C and D. Each had an assessed value of $100 on the last equalized assessment roll prior to the effective date of the ordinance approving the redevelopment plan (hereinafter referred to as the base roll). After

redevelopment parcels A, B and C had an assessed value of $200 each and parcel D had an assessed value of $150. Assume also that the rate of tax is a constant 10%. And assume, finally, that parcel A is later acquired by another public agency.

"Prior to redevelopment the total taxes raised in the area are $400 × 10% or $40, and the taxing agencies are entitled to the entire amount. After redevelopment, the total taxes raised are $750 × 10% or $75 and the taxing agencies are entitled to $40 and the redevelopment agency special fund is entitled to $35 . . . .

"After the acquisition of parcel A by another public agency, the total taxes drop to $550 × 10% or $55. How is the $55 divided between the taxing agencies and the redevelopment agency special fund? There are three possible results and an argument to support each. The first is the redevelopm[e]nt agency special fund gets $35 and the taxing agencies get $20 on the theory that the redevelopment agency special fund should continue to receive the amount representing the total increase in assessed value which occurred after redevelopment. The second is that the taxing agencies should continue to receive $40 and the redevelopment agency special fund receives only $15 on the theory that the taxing agencies should continue to receive the full amount that they were entitled to receive when redevelopment was first completed. The third possible result is that the taxing agencies get $30 and the redevelopment agency special fund gets $25 on the theory that each ought to share proportionately in the loss of revenue due to the removal from the tax roll of the specific parcel of property.

"The result turns on the proper interpretation of the phrase 'the total sum of the assessed value of the taxable property in the redevelopment project as shown' upon the base roll which appears in Article [XVI], section [16], subsection (a), *supra*. Although the first alternative could only be reached by a tortured construction of the above words, the language could support either of the other alternatives. The fact that the 'total sum of the assessed value' is referred to might be used to argue that the amount of taxes due to the taxing agencies should never fall below the amount which they would have received if the total assessed value as carried on the base roll were used in computing the tax. The more reasonable conclusion, however, is that the taxing agencies should receive only the amount of taxes which they would have received had there been no redevelopment project and that this amount is to be computed by

applying the current rate to the total sum of the assessed value of the remaining taxable property on the base roll. In other words, the 'total sum of the assessed value of the taxable property' must be redetermined whenever any parcel of property ceases to be 'taxable property.' " (35 Ops.Cal.Atty.Gen. 211, 212-213 (1960).)

For reasons which we shall explain, we agree with the Attorney General that the "assessed value of the taxable property" within the redevelopment project must be redetermined whenever project property is acquired by a tax exempt agency, and thus that the loss of tax revenue resulting from that acquisition should be divided proportionately between the redevelopment agency special fund and the taxing agencies. The trial court in the present case arrived at a contrary conclusion; declining to redetermine the assessed value of taxable property, it placed the entire loss of revenue on the redevelopment agency. We therefore reverse the decision of the trial court.

On February 24, 1965, and by amendment on March 17, 1970, the Council of the City of San Bernardino adopted ordinances approving the redevelopment plan for Central City Project No. 1, Calif. R-79. The plan provided that after the effective date of the ordinance approving the plan, any taxes levied upon taxable property within the project would be allocated pursuant to the Community Redevelopment Law. The plan further provided that plaintiff Redevelopment Agency of the City of San Bernardino could issue bonds payable from any source authorized by state law, including tax revenues allocated and paid to the agency's special fund. The redevelopment agency subsequently authorized the issuance of $14,800,000 of bonds secured by an irrevocable pledge of its tax revenues.

After adoption of the plan, the redevelopment agency acquired certain property in the project that had been taxable at the time of the plan's adoption. The agency leased portions of the property to the city for a term of 50 years for use as a pedestrian mall and public parking lot. The agency deeded other formerly taxable property to the city for streets and public rights of way. Defendant County of San Bernardino does not presently tax this city-owned and city-leased property.

On April 24, 1973, the redevelopment agency requested that the county assessor reduce the sum of assessed value shown on the project base assessment roll by the assessed value, as shown on the roll, of the

property acquired by the city, and reallocate tax revenues for the 1973-1974 tax year received from property within the project on the basis of the requested adjustment. When the county assessor refused to comply, the agency filed the underlying petition for writ of mandate to compel the requested base roll adjustment and reallocation.

The trial court initially identified the purpose underlying the constitutional provision for tax increment financing of community redevelopment: "to return to the taxing agencies the tax revenues they would have received had there been no redevelopment, and to permit the increase above that formerly received from the blighted area to be used to pay off the cost of redevelopment." Finding that the change in status of property from taxable to tax exempt occurred "pursuant" to the redevelopment plan and was in part "responsible for any increase in the assessed valuation of property within the redevelopment," the court held that reduction of the assessment roll would frustrate the constitutional purpose by dramatically decreasing the amount of tax revenues available to the defendant taxing agencies[2] and by providing a "windfall" in increased revenues to the redevelopment agency. Accordingly the court denied the petition for writ of mandate and this appeal followed.

Plaintiffs first contend that the trial court's decision interpreting "taxable property" as used in article XVI, section 16 to mean property shown as taxable property on the base assessment roll abandons a long established construction that "taxable property" means *currently* taxable property. Plaintiffs cite *Redevelopment Agency* v. *Malaki* (1963) 216 Cal.App.2d 480, 489 [31 Cal.Rptr. 92], in which the court stated that the word "taxable" is "descriptive of a fluid legal status and has no temporal import, perhaps describing status at any time, that is, whenever taxes are being assessed and collected."[3]

---

[2]The taxing agencies in the present case include the County of San Bernardino, San Bernardino County Flood Control District, San Bernardino Valley Municipal Water District, San Bernardino Unified School District, and San Bernardino Valley Community College District.

[3]See also 27 Ops. Cal. Atty. Gen. 352, 355 (1956): "We have been asked whether the term 'taxable property' [as used in article XVI, section 16] includes tax-exempt property. [¶] We believe it is clear that that term does not include tax-exempt property. The adjective 'taxable' means 'capable of being taxed; liable by law to the assessment of taxes' (Webster's New Int. Dict. (2d ed. unab. 1951) p. 2587), and thus excludes property which is exempt by law from taxation by reason of its ownership . . . ."

In *Malaki,* the Capitol Mall redevelopment project covered 10 blocks of downtown Sacramento. A year after adoption of the redevelopment plan, when the state determined to buy four blocks of the project from the redevelopment agency for use as a freeway, the redevelopment agency and the state agreed to eliminate the assessed value of the four-block area from the base assessment roll. Although the redevelopment plan was subsequently amended to accommodate the acquisition, the chairman of the county board of supervisors refused to sign the agreement on the ground that it violated article XVI.

In granting the redevelopment agency a writ of mandate to compel the chairman's signature, the Court of Appeal rejected the chairman's literal reading of article XVI, which would have "unalterably peg[ged]" future tax revenue payable to the local taxing agencies at an amount equal to that which the total of all assessed values in the project area as shown on the assessment roll last equalized would produce. (216 Cal.App.2d at p. 485.) Acknowledging that the draftsmen of article XVI clearly recognized the creation of tax exemptions through public acquisition, the court noted that "[n]evertheless, in referring to the 'last equalized' assessment rolls, the draftsmen overlooked the fact that these rolls are physical, tangible documents on which properties are immutably inscribed, even though some . . . might someday pass into public ownership and hence provide no tax revenue." (216 Cal.App.2d at p. 486.)

The court resolved this ambiguity in favor of the constitutional objective: "The objective is to make augmented property values the source of new tax revenue to be used for servicing tax allocation bonds; to facilitate redevelopment by facilitating the bonds and not to present general government with a tax windfall by immunizing it against the loss occasioned by public acquisitions. The word 'taxable,' then as it appears in subdivisions (a) and (b) of article [XVI], section [16], is aimed at future exclusion of publicly owned property; thus the total assessed value shown upon the assessment rolls last equalized before the effective date of redevelopment approval is to be diminished, from time to time, by the assessed values, as shown upon those rolls, of any properties acquired by tax-exempt public entities." (216 Cal.App.2d at p. 490.)

Defendants attempt to distinguish *Malaki* from the present case. As they argue, *Malaki* held merely that the *agreement* to eliminate the assessed value of the freeway blocks did not violate article XVI. In approving the parties' agreement, however, the court in *Malaki* clearly

found that article XVI mandated the agreed upon readjustment. More-over, the defendants' limited reading of a case interpreting constitutional language is especially unwise in light of other decisions approving the result in *Malaki*. In *Redevelopment Agency v. Cooper* (1968) 267 Cal.App.2d 70 [72 Cal.Rptr. 557], the court held *Malaki* applicable to a redevelopment project whose plan was amended for the purpose of acquiring property to be devoted to use as a public subway station.

Similarly, the Attorney General opinion quoted earlier, in answer to the question, "Who must bear the loss in revenue which follows the acquisition of taxable property in a redevelopment project by another public agency," stated that "[t]he more reasonable conclusion" is that the "taxing agencies should receive only the amount of taxes which they would have received had there been no redevelopment project and that this amount is to be computed by applying the current rate to the total sum of the assessed value of the remaining taxable property on the base roll." (35 Ops.Cal.Atty.Gen. 211, 213 (1960); see also 56 Ops.Cal.Atty. Gen. 464, 472, fn. 7 (1973), approving *Malaki*.) Under this reasoning, realty located within Central City Project No. 1 and owned by or leased to the City of San Bernardino is not "taxable property" for the purposes of computing allocation of tax revenues.[4]

That this conclusion leads to the "more reasonable" result is clear. Under the trial court's approach, the situation may well arise in which the redevelopment agency special fund would receive no income from taxes, and therefore may have no means to pay off loans, assessments, indebtedness and interest. The practical effect of such a result would be to cripple the redevelopment program: as plaintiffs emphasize, a redevelopment agency will be unable to sell its bonds if purchasers cannot depend upon the agency's having a source of revenue from which to meet

---

[4]The trial court correctly assumed that the property in question is tax exempt. Property "owned by a local government" or "belonging to . . . a county, or a city" is exempt from property taxation. (Cal. Const., art. XIII, § 3, subd. (b); Rev. & Tax. Code, § 202, subd. (a)(4).) That the City of San Bernardino only leases some of the property does not render the property taxable, for both lessee city and lessor redevelopment agency are constitutionally exempt from taxation. (See *Housing Authority v. Dockweiler* (1939) 14 Cal.2d 437, 454 [94 P.2d 794].) Health and Safety Code section 33673, which provides that "property . . . leased by the redevelopment agency to any person or persons . . . shall be assessed and taxed in the same manner as privately owned property" is inapplicable: the statute merely prevents the transfer of the agency's tax-exempt status to private parties.

its obligations. "It is unreasonable to assume that either the Legislature or the people intended such a result."[5] (35 Ops.Cal.Atty.Gen. 211, 213.)

Thus we reject the trial court's distinction that property acquired by a public entity "pursuant" to a redevelopment plan remains taxable, while property in a redevelopment project which "passes into public ownership for purposes unrelated to the scheme of redevelopment" becomes nontaxable. This distinction would require not only the difficult determination of what would have occurred "but for" the adoption of a redevelopment plan; it would also increase the uncertainty as to adjustment of the base roll for public acquisitions, thereby seriously impairing the redevelopment agency's ability to determine the increase in assessed value which secures its bonds. Moreover, the court's distinction is inconsistent with the clear language of article XVI, section 16, providing that "All property in a redevelopment project ... , *except publicly owned property not subject to taxation* by reason of such

---

[5]The Report of the Joint Senate-Assembly Interim Committee on Community Redevelopment and Housing Problems, page 22, 1 Appendix to Senate Journal (1951 Reg. Sess.), clearly demonstrates the Legislature's intent in proposing article XVI that community redevelopment programs be "self-liquidating":

"Financing development projects even with the liberal federal grants made available under Public Law No. 171 still remains one of the major problems with which redevelopment agencies are confronted.

"The normal procedure is to raise one-third of the cost through city-wide bond issues. Under mounting tax rates created by expanding costs of city government, and urgent new appropriations for civil defense, the likelihood of residents of a city voting bonds to improve a section of a community remote from them, and from which they can see no special personal benefits, is somewhat diminished.

"Explorations were made for other means of financing community redevelopment projects other than from city-wide bond issues, or in some minor cases from the general fund. Proposals have been made by Los Angeles and San Francisco city officials, as well as by the League of California Cities and prospective redevelopers, that legislation be created to make possible liquidation of funds used in redevelopments through the increased tax revenues from the redevelopments themselves.

"Such a proposal would take the form of a constitutional amendment. It would allow city or county governments to earmark the increased taxes received from the increased property values of a completed redevelopment project for payment of the city's expenditure in the project.

"It is assumed that the assessed valuation of a redevelopment on a previously blighted area would increase on the city rolls several hundred percent. If the taxes in the amount of the increase above that received formerly from the blighted area could be placed in a special fund, it is believed they would be sufficient to pay off the community's loss in the acquisition, demolition and resale of the land. It has been pointed out by its proponents that if legislation were passed to allow such an allocation of taxes, it would remove redevelopment programs from community politics and would establish a climate of direct fiscal estimating understood and preferred by private enterprise. The committee recommends that this proposal be further explored and investigated with the purpose of presenting such a constitutional amendment to the electorate of the State."

ownership, shall be taxed in proportion to its value . . . , and such taxes . . . shall be levied and collected as other taxes are levied and collected by the respective taxing agencies." (Italics added.)

Besides distorting redevelopment financing, the trial court's decision frustrates the Legislature's fundamental goals in providing for community redevelopment, for the trial court would penalize redevelopment projects for their acquisition of property for public improvements. The Legislature has specifically stated that "a fundamental purpose of redevelopment is to . . . provide an environment for the social, economic, and psychological growth and well-being of all citizens," and thereby to remedy the blight which "inadequate public improvements, public facilities, open spaces, and utilities" cause. (Health & Saf. Code, §§ 33071, 33032, subd. (d).)

Our decision will not defeat the objective that the trial court identified as a "purpose" of tax increment financing, that is, "to return to the taxing agencies the tax revenues they would have received had there been no redevelopment." The allocation of tax revenues for redevelopment pursuant to article XVI is limited to that amount necessary to pay the costs of redevelopment; once the redevelopment debts have been repaid, "then all moneys thereafter received from taxes upon the taxable property in such redevelopment project shall be paid into the funds of the respective taxing agencies as taxes on all other property are paid." (Cal. Const., art. XVI, § 16, subd. (b).) Thus the sooner the special redevelopment agency fund pays the costs of redevelopment, the sooner will the trial court's objective—to preserve tax revenues to the taxing agencies—be attained.

In holding that the words "taxable property" as used in article XVI, section 16 means property *currently* taxable, we are mindful of our own injunction regarding interpretation of constitutional provisions. **(2)** "When certain constitutional constructions have been acquiesced in for years, under which vested rights have grown up, it would be dangerous to disturb them, and better on the ground of public policy, to sanction than destroy public confidence, by inquiring whether they are correct or not." (*People* v. *Wells* (1852) 2 Cal. 198, 208.) The record in the present case demonstrates that the administrative practice in several California counties and cities for the past 15 years has been to exclude from the base assessment roll the assessed value of property acquired by public entities for public use, in reliance upon the decisions in *Redevelopment Agency* v.

*Malaki, supra, Redevelopment Agency* v. *Cooper, supra,* and upon the opinions of the Attorney General previously cited.[6]

■ To summarize, we have attempted to set forth the reasonable and accepted interpretation of the Constitution's language "assessed value of the taxable property in the redevelopment project" when project property is acquired by a tax-exempt agency. We think "taxable property" means property currently taxable; we believe that the assessed value of the taxable property should be redetermined so that the loss of the revenue resulting from the acquisition should be divided proportionately between the redevelopment agency special fund and the taxing agencies. In so doing we not only follow the interpretation of the Attorney General and the courts; we apply a practical and common sense approach, eschewing the reversal of decisions which would result in the destruction of the security of many millions of dollars of outstanding tax allocation bonds.

We reverse the judgment of the trial court.

Bird, C. J., Mosk, J., Clark, J., Richardson, J., Manuel, J., and Newman, J., concurred.

Respondents' petition for a rehearing was denied July 13, 1978.

---

[6]The Legislature as well has acquiesced in this interpretation of the Constitution. Conspicuously absent from its 1976 legislation dealing with the Community Redevelopment Law and tax allocation financing is any modification of the formula for allocation in Health and Safety Code section 33670. (See, e.g., Health & Saf. Code, §§ 33320.2, 33321, 33327-33328.4, 33333.2, 33334.1-33334.2, 33338.1, 33352-33354.6, 33367, 33401, 33433, 33675, added and amended by Stats. 1976, ch. 1336, §§ 7-9, 11.5, 12; ch. 1337, §§ 1-4, 6-7, 9-12, 14-16, 18-20, 22.) "[A] familiar and fundamental rule for the interpretation of a legislative statute is that it is presumed to have been enacted in the light of such existing judicial decisions as have a direct bearing upon it." (*Estate of Moffitt* (1908) 153 Cal. 359, 361 [95 P. 653], affd. (1910) 218 U.S. 400 [54 L.Ed. 1086, 31 S.Ct. 79].)