[Civ. No. 64757. Second Dist., Div. Two. Sept. 15, 1982.]

PASADENA REDEVELOPMENT AGENCY, Plaintiff and Respondent, v.
POOLED MONEY INVESTMENT BOARD et al., Defendants and Appellants.

**COUNSEL**

George Deukmejian, Attorney General, and Richard M. Radosh, Deputy Attorney General, for Defendants and Appellants.

Weiser, Kane, Ballmer & Berkman, Herbert M. Weiser, T. Brent Hawkins, Lance E. Garber, O'Melveny & Myers, Bertrand M. Cooper and Keith H. Beyler for Plaintiff and Respondent.

**OPINION**

**BEACH, J.**—The Pasadena Redevelopment Agency (hereafter Agency) petitioned the superior court for a writ of mandate to compel the Pooled Money Investment Board (hereafter Board) to grant it a loan from the local agency indebtedness fund to prevent a default on its downtown redevelopment project 1976 tax allocation bonds. The court ordered issuance of the writ. The Board appeals. We affirm.

In 1976 and 1977 the Agency issued $58 million in tax allocation bonds to finance a redevelopment[1] project in downtown Pasadena.

Monies for the payment of the principal and interest on bonds issued for redevelopment purposes are generally obtained through taxes levied on property located in the redevelopment area. That portion of the taxes levied each year in excess of a certain amount is allocated to a special fund of the redevelopment agency to pay for the principal and interest of the bonds. The term "tax allocation bonds" is applied to redevelopment bond issues resting on the security of such excess tax revenue. (*Redevelopment Agency* v. *Malaki* (1963) 216 Cal.App.2d 480, 484 [31 Cal.Rptr. 92].) Once the bond obligation is paid off, the separate allocation of excess revenue ceases and all of the taxes then go to the taxing agencies. (Health & Saf. Code, § 33670; *Redevelopment Agency* v. *Malaki, supra*, at pp. 483-484.)

The passage of Proposition 13 (Cal. Const., art. XIII A, §§ 1-6) in June 1978 by the voters of this state had a significant impact on the tax increment revenues available to the Agency for retirement of the bonds. Proposition 13 reduced the maximum property tax rate to 1 percent, it rolled back assessments to the values assigned in the 1975-1976 base year, and it put a cap on subsequent reassessments unless there was a change in ownership or new construction. These changes in property assessment reduced available tax increment revenues for the retirement of the Agency's bonds by approximately two-thirds.

Recognizing it would be in the public interest of the state to protect its credit and that of local agencies by assuring that no bond of a local agency would go into default, the Legislature immediately after the passage of Proposition 13 enacted a number of provisions to prevent default. Thus, Government Code section 16496, which became effective June 24, 1978, provides: "The Legislature finds and declares that local agencies may be required to reorganize revenue sources currently used as security for the payment of local agency bonds which have not been voter-approved, that until such time as that reorganization of revenue sources occurs, *it is in the public interest of the state to protect the credit of the state and local agencies by assuring that no bond of a lo-*

---

[1]As the court in *Redevelopment Agency* v. *Malaki* (1963) 216 Cal.App.2d 480, 482 [31 Cal.Rptr. 92] explained: "Elimination of blighted areas by redevelopment finds its constitutional basis in protection of public health, morals, safety and general welfare. (Citation omitted.) A beneficial byproduct is the upgrading of real estate values, thereby increasing assessed values on public tax rolls and augmenting public tax revenues."

*cal agency goes into default. If a default were allowed to occur, the credit and the future borrowing capacity of both local agencies and the state could be impaired. Therefore, there is need for the state to make loans to local agencies for the purpose of avoiding a default in the payments due under any bond of a local agency.* [¶] In order to meet this need, the state, in this article, hereby establishes a separate Local Agency Indebtedness Fund, to be administered in accordance with the provisions of this article." (Italics added.)

In the instant matter the Board granted two loans to the Agency, one in 1978 and the other in 1979. Approval thereof was based on the Agency's demonstrated ability to repay the loans within the specified time. In October 1980 the Agency again applied to the Board for a loan of $1,817,290 based on its lack of funds to make the required payments on the bonds during the 1980-1981 fiscal year. The Board denied the loan.[2] It appears from the record that the denial was based on the Agency's alleged failure to demonstrate ability to repay the loan within the "maximum repayment period of 20 years" provided for in Government Code section 16499.

In March 1981, the Agency petitioned the superior court for a writ of mandate to compel the Board to grant the Agency a loan of $1,817,290. The court granted the petition, stating: "The loan in question appears to be precisely the type contemplated by the legislature in establishing the Local Agency Indebtedness Fund. Since petitioner satisfies the requirement of Government Code section 16499, respondent has no discretion in the matter." The Board appeals, contending that approval of the loan was within its discretion and that therefore the superior court erred in issuing a writ of mandate compelling the Board to grant the loan.

In creating the local agency indebtedness fund the Legislature specifically stated it was for the purpose of preventing "technical or actual default from occurring" in the bond payments. (Gov. Code, § 16497.5.) The parties agree that the Agency was in technical default at the time it applied for the loan at issue. In its brief, the Agency explains technical default as follows: "'Technical', as opposed to 'actual' or 'cash' default occurs when, due to the diminished flow of tax increment, reserves which are required to be maintained at stated levels must

---

[2]In January 1981, the Agency filed a petition for writ of mandate in the Third Appellate District of the state Court of Appeal. The court summarily denied the petition on February 26, 1981.

be used to make annual debt service payments and there are insufficient funds to restore those reserves to the level at which they are pledged to be maintained. (Citation omitted.) The consequences of a technical default are severe. Under the bond indenture, such an occurrence constitutes an event of default, which if not cured within 60 days after notice, triggers the acceleration of all outstanding principal and accrued interest. (Citation omitted.)"

Government Code section 16499, the pertinent statute here, then provided that the Board "*shall* make a loan to a local agency applying for such loan in order to prevent an imminent default on the bonds of such local agency." It further provided that the Board "*may* make such a loan only after a finding that: (a) The local agency has insufficient funds to make principal and interest payments during the 1978-79, 1979-80, or 1980-81 fiscal year; and (b) Where bonds have been issued which are secured by tax increment, evidence that the taxes allocated under subdivision (b) of Section 33670 of the Health and Safety Code are inadequate to make the principal and interest payments on bonds due during the 1978-79, 1979-80, or 1980-81 fiscal year." (Italics added.) The provision in the statute that the Board "shall make a loan" indicates the mandatory nature of the statute. (Gov. Code, § 14.) The Board, however, relies on the Legislature's use of the word "may" later in the statute to support the Board's argument that the granting of a loan under the statute is discretionary, depending on the applicant's ability to repay the loan.

Absent a single meaning of the statute on its face, we must give it an interpretation based on the legislative intent with which it was passed. (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 256 [104 Cal.Rptr. 761, 502 P.2d 1049]; *Benor* v. *Board of Medical Examiners* (1970) 8 Cal.App.3d 542, 546-547 [87 Cal.Rptr. 415].) The use of the word "shall" in the statute is not surprising when we consider the purpose of the post-Proposition 13 legislation creating the local agency indebtedness fund. In creating that fund, the Legislature specifically stated it was for the purpose of extending loans to local agencies to assure "that *no* bond of a local agency goes into default," thus protecting the credit of the state and local agencies. (Gov. Code, § 16496.) It would appear that to ensure that "no bond" would go into default the Board would be *required* to grant a loan to the applying agency if it meets the requirements of Government Code section 16499 as is the case here. As noted earlier, that section requires an applying agency to show (a) it has insufficient funds to make the required payments on the

bonds, and (b) its allocated taxes are also insufficient. In this case, there is no dispute that the Agency met these two requirements. This showing goes to the applicant's need for a loan. Nothing in the section says anything about the applicant's ability to repay the loan.

At the time the Legislature created the local agency indebtedness fund it also created a local agency emergency loan fund. The latter fund was for the purpose of making short-term loans available to local agencies to meet "operating costs at the end of the 1977-78 fiscal year and during the 1978-79 fiscal year." (Gov. Code, § 16493.5.) ▮ In construing a statute, a court may consider other statutes which might bear on the meaning of the statute at issue. (*People* v. *Corey* (1978) 21 Cal.3d 738, 743 [147 Cal.Rptr. 639, 581 P.2d 644].) ▮ In creating the emergency loan fund, the Legislature expressly provided that the Board "may approve, reduce, or deny" any application for a loan from the fund. (Gov. Code, § 16495.) By contrast, in creating the indebtedness fund, the Legislature remained silent on the Board's discretion to approve, reduce, or deny any loan application. Additionally, while the legislation governing the local agency emergency fund requires repayment of any loan granted under it and provides for certain remedies if the borrower fails to pay on time (Gov. Code, § 16495.5), the legislation governing the local agency indebtedness fund contains nothing on repayment or on remedies available to the Board in the event of late payment.

We conclude that the trial court acted properly when it ruled that under the statute the Board was required to make the loan.

The judgment is affirmed.

Roth, P. J., and Compton, J., concurred.

A petition for a rehearing was denied October 15, 1982, and appellants' petition for a hearing by the Supreme Court was denied December 9, 1982. Newman, J., did not participate therein.