[No. S000820. Oct. 13, 1988.]

JAMES H. MAREK, JR., as Auditor-Controller, etc., Plaintiff and Appellant, v.
NAPA COMMUNITY REDEVELOPMENT AGENCY, Defendant and Respondent.

**COUNSEL**

R. Clifford Lober, County Counsel, Joseph C. Folkard and David L. Zaltsman, Deputy County Counsel, for Plaintiff and Appellant.

McDonough, Holland & Allen, Richard E. Brandt and David F. Beatty for Defendant and Respondent.

Lee C. Rosenthal and Goldfarb & Lipman as Amici Curiae on behalf of Defendant and Respondent.

OPINION

KAUFMAN, J.—To receive tax increment revenues (see fn. 3, *post*) under California's Community Redevelopment Law (Health & Safety Code, § 33000 et seq.), local redevelopment agencies must file with the county auditor an annual "statement of indebtedness." (Health & Saf. Code, § 33675, subd. (b) (see fn. 8, *post*).)[1] The auditor is then required to pay tax increment revenues to the agency "in an amount not to exceed the amount shown on the agency's statement of indebtedness." (§ 33675, subd. (d).) If the auditor disputes the amount of indebtedness claimed in its statement, the auditor is authorized to institute a declaratory relief action to adjudicate the amount of indebtedness. (§ 33675, subd. (e).)

In the 1981-1982 and 1982-1983 statements of indebtedness submitted by the Napa Community Redevelopment Agency (Agency) to James Marek, the Auditor-Controller for the County of Napa (Auditor), the indebtedness claimed by the Agency consisted of the estimated cost of performing its executory obligations under a binding contract with a private redeveloper. The Auditor disputed the claimed indebtedness, refused to pay the Agency the accrued tax increment revenues and instituted the declaratory relief action at bench. We are called upon to decide whether the Agency's claimed indebtedness constitutes indebtedness under the redevelopment law. As will appear, we conclude that the Agency's estimated cost of performance under the contract does constitute indebtedness within the meaning of the redevelopment law and that the Auditor was required to pay the Agency the available tax increment revenues.

I. *Factual and Procedural Background*

A. *History of the Redevelopment Plan*

The Parkway Plaza Redevelopment Project (project) was originally part of an urban redevelopment plan adopted in 1969 by the Napa City Council[2] to convert the downtown area of Napa into a modern shopping district. The plan was to be financed in substantial part by tax increment financing as authorized by article XVI, section 16 and by section 33670 which was enacted by the Legislature to implement the constitutional provision. The text of section 33670 which repeats the constitutional language is set out in the margin.[3]

---

[1] All statutory references, unless otherwise noted, will be to the Health and Safety Code. Citations to articles and sections will refer to the California Constitution.

[2] The Napa City Council functions as the governing body of the Napa Community Redevelopment Agency.

[3] Section 33670 provides in pertinent part: "Any redevelopment plan may contain a provision that taxes, if any, levied upon taxable property in a redevelopment project each year by

Following the adoption of the redevelopment plan, the Agency in 1971 entered into a Disposition and Development Agreement (DDA) with the private redeveloper Nichandros Associates (Nichandros) for the development of the downtown shopping district. Difficulties developed between the Agency and Nichandros and their agreement was eventually terminated. Nichandros thereafter sued the Agency for damages and recorded a lis pendens on property within the redevelopment site. The Agency ultimately settled the suit by paying Nichandros nearly $400,000.

The dispute between the Agency and Nichandros delayed the project for some years. Nevertheless, the record indicates the Agency was able to accomplish considerable redevelopment in the project area during the years leading up to the present dispute. This included construction of department stores and other retail shops, street and traffic improvements, brick inlays, and the like. This work was apparently funded in part by some $10 million in grants from the federal Department of Housing and Urban Development. However, the Agency also received more than $3 million of tax increment revenues between 1971 and 1981 from Auditor Marek and his predecessor in office, Robert Benning.

B. *Earlier Dispute Between the Parties*

In 1977 the Agency and former auditor Benning had a dispute over payment of tax increment revenues. Benning instituted a declaratory relief action against the Agency alleging among other things that the Agency's

---

or for the benefit of the State of California, any city, county . . . , district, or other public corporation (hereinafter sometimes called 'taxing agencies') after the effective date of the ordinance approving the redevelopment plan, shall be divided as follows:

"(a) That portion of the taxes which would be produced by the rate upon which the tax is levied each year by or for each of the taxing agencies upon the total sum of the assessed value of the taxable property in the redevelopment project as shown upon the assessment roll used in connection with the taxation of such property by such taxing agency, last equalized prior to the effective date of such ordinance, shall be allocated to and when collected shall be paid to the respective taxing agencies as taxes by or for said taxing agencies on all other property are paid . . . ; and

"(b) *That portion of the levied taxes each year in excess of such amount shall be allocated to and when collected shall be paid into a special fund of the redevelopment agency to pay the principal of and interest on loans, moneys advanced to, or indebtedness (whether funded, refunded, assumed, or otherwise) incurred by such redevelopment agency to finance or refinance, in whole or in part, such redevelopment project.* Unless and until the total assessed valuation of the taxable property in a redevelopment project exceeds the total assessed value of the taxable property in such project as shown by the last equalized assessment roll referred to in subdivision (a), all of the taxes levied and collected upon the taxable property in such redevelopment project shall be paid to the respective taxing agencies. *When such loans, advances, and indebtedness, if any, and interest thereon, have been paid, all moneys thereafter received from taxes upon the taxable property in such redevelopment project shall be paid to the respective taxing agencies as taxes on all other property are paid.*" (Italics added.)

statement of indebtedness for fiscal year 1977-1978 was deficient. Thereafter Marek was elected and replaced Benning as plaintiff in that lawsuit. The matter was resolved in January 1979 when the parties negotiated a settlement in the form of a stipulated judgment entered by the superior court.

The stipulated judgment outlined a number of procedures relating to the submission and review of annual statements of indebtedness thereafter. Under these procedures, the Agency was to maintain accounting records reflecting the status of the "special fund" into which tax increment revenues are paid pursuant to section 33670, subdivision (b) (see fn. 3, *ante*). Additionally, subsequent statements of indebtedness were to show all funds of the Agency "on hand or otherwise available" and separately account for funds arising from tax increment revenues and from other sources. Further, the Agency was to identify the moneys committed to specific obligations or indebtedness and to provide the Auditor copies of contracts documenting the claimed indebtedness. In this regard the stipulated judgment provided: "To the extent [the] Agency has any monies . . . which are not specifically committed or allocated to a particular obligation or indebtedness of the Agency, the . . . Auditor shall consider such monies as being available for general expenditure purposes to pay, in whole or in part, any of the indebtedness shown on [the] Agency's Statement of Indebtedness when [the] Auditor calculates the distribution of tax increment revenues pursuant to Health and Safety Code Section 33675(d)."

## C. *The Present Dispute*

In February 1980, the Agency amended the original redevelopment plan and entered into a new DDA with another redeveloper called The Sequoia Partnership (Sequoia) for the redevelopment of a 10-acre site within the Parkway Plaza project. Under the Sequoia DDA, the Agency was obligated to acquire certain parcels of real property, to resell the property to the redeveloper and to provide for and bear the expense of utility relocations, street and traffic improvements, and the construction of parking facilities.[4] Sequoia agreed to purchase the land from the Agency, to construct a shopping center with a large department store and other retail shops, and to secure tenants for the shopping complex.

After execution of the Sequoia DDA in 1980, the Agency acquired two properties, one at a cost of some $150,000 (paid from a federal community development block grant) and the other for some $830,000 (paid from the previous year's tax increments and out of funds the Agency borrowed from

---

[4] For simplicity, the Agency's activities during the acquisition phase will sometimes be referred to as "preconveyance" and events scheduled to take place thereafter will sometimes be denominated "postconveyance."

the City of Napa after the present dispute arose). In addition, the Agency incurred other expenses and was proceeding with negotiations and condemnation actions to acquire the two remaining parcels necessary to fulfill its preconveyance obligations under the Sequoia DDA.

■ ■■■■ In 1980, the Agency submitted to the Auditor a statement of indebtedness for fiscal year 1980-1981,[5] pursuant to section 33675, subdivision (b) (see fn. 8, *post*). The 1980-1981 statement listed a partial indebtedness of $800,000, identified by the phrase "Implement DDA" (i.e., to implement the DDA with Sequoia). The record indicates that for fiscal year 1980-1981 the Auditor disbursed to the Agency tax increments amounting to $439,000.

In September 1981, the Agency filed a statement of indebtedness with the Auditor for fiscal year 1981-1982. The statement showed a total outstanding indebtedness of $1.35 million—$1.31 million to implement the Sequoia DDA (again identified by the phrase "Implement DDA") and $40,000 for administrative costs. In October 1981, the Auditor sent the Agency a letter disputing the Agency's 1981-1982 statement of indebtedness. Relying on the 1979 stipulated judgment, the Auditor stated he interpreted the statement of indebtedness and supporting materials as showing the Agency had ample funds available from sources other than the tax increment revenues to pay its obligations and thus that the Agency had no true indebtedness. Apparently, within its stated amount of available funds the Agency had included the $550,000 in tax increment revenues it expected would be paid to it by the Auditor during 1981-1982. The Auditor evidently read the declaration of available funds as not including the $550,000.

After some correspondence with the Auditor, the Agency submitted an amended statement of indebtedness. In an accompanying letter, the Agency stated it planned to sell bonds to finance the great bulk of the Agency's postconveyance obligations under the DDA. In order to keep the amount of the bond issue and attendant interest expense to a minimum, however, the

---

[5]The Agency's 1980-1981 statement of indebtedness was not introduced into evidence at trial. However, pursuant to this court's request, the Auditor furnished us a copy of that statement. Before, during, and after oral argument, the parties have been afforded reasonable opportunity to present, and have indeed presented, information and argument regarding the propriety of our taking judicial notice of the 1980-1981 statement of indebtedness and the tenor of that document in this case. (Evid. Code, §§ 459, subd. (c) & 455, subd. (a).) We have determined that, as an official record of the office of the Auditor-Controller of Napa County, the 1980-1981 statement of indebtedness is properly subject to judicial notice. (Evid. Code, § 452, subd. (c) ["Official acts of the . . . executive . . . department[ ] . . . of any state"]; 1 Witkin, Cal. Evidence (3d ed. 1986), Judicial Notice, § 98, pp. 84, 85 [county agency constitutes state entity for purposes of judicial notice]; *Watson* v. *Los Altos School Dist.* (1957) 149 Cal.App.2d 768, 772 [308 P.2d 872]; accord, *Agostini* v. *Strycula* (1965) 231 Cal.App.2d 804, 806 [42 Cal.Rptr. 314].)

Agency hoped to use the tax increment revenues directly to finance the "front-end project costs" such as acquisition of property, design, street clearing, site improvements, and administration. The amended statement included only minor accounting changes without making any substantive modifications. Because the Auditor still disputed the amount of indebtedness claimed by the Agency, in December 1981 he issued a final notice of the statement's deficiencies and of his intent to withhold the available tax increment funds and to seek declaratory relief if the Agency did not comply with the Community Redevelopment Law and with the 1979 stipulated judgment.

In February 1982, the Agency submitted a drastically revised statement of indebtedness. As its total outstanding debt the Agency declared more than $11.9 million, some $11.7 million of which was identified as indebtedness under the Sequoia DDA. Annotations and supporting materials submitted with the revised statement indicated the Agency's substantially increased claim of indebtedness represented the estimated cost of performing *all* of its obligations under the DDA until completion of the project, including purchasing the remaining parcels of land, conveying all the acquired property to the redeveloper and completing all the necessary utility relocations, street improvements and parking facility construction. The revised statement also included an estimate of the Agency's expenditures to be made only during 1981-1982—$1.25 million.

In March 1982 the Auditor filed the instant declaratory relief action pursuant to section 33675, subdivision (e).[6] In September 1982, before the matter went to trial, the Agency submitted to the Auditor its 1982-1983 statement of indebtedness claiming an amount exceeding $12.3 million of which some $11.9 million was declared as indebtedness for the Agency's total obligations under the Sequoia DDA, the estimate for necessary expenditures during 1982-1983 alone being some $900,000. The Auditor thereafter amended his complaint to state the reasons he believed the Agency was

---

[6] Section 33675, subdivision (e) (see fn. 8, *post*), permits a county auditor to institute a declaratory relief action when he or she disputes the amount of indebtedness claimed. "The issue in any such action shall involve *only the amount of indebtedness, and not the validity of any contract or debt instrument or any expenditures pursuant thereto.*" (§ 33675, subd. (e), italics added.) The Agency has maintained throughout this case that the Auditor's position, at its core, engendered an attack on the validity of the DDA and therefore that the action itself was improper under section 33675. Amicus curiae Community Redevelopment Agencies Association has likewise stressed that point.

We disagree. The Auditor is correct that the issue whether the Agency's prospective expenditures under the Sequoia DDA constituted indebtedness presented a question fundamentally related to the *amount* of the Agency's indebtedness and not directly related to the validity or enforceability of the agreement. Therefore, the merits aside, the Auditor's election to challenge the Agency's statement of indebtedness by means of this declaratory relief action pursuant to section 33675, subdivision (e), was within the authority given him by the statute.

not entitled to receive the tax increment revenues claimed for 1982-1983. At trial the amount of tax increment revenues at stake was $550,000 for 1981-1982 and $594,000 for 1982-1983—a total of $1,144,000.[7]

During trial the Agency presented uncontroverted expert testimony that it was accepted administrative practice among county auditors in at least four counties to treat a redevelopment agency's projected expenditures under a DDA as indebtedness qualifying the agency to receive tax increment revenues. By contrast, the Auditor testified to his belief that, in order to receive tax increment revenues, the Agency was required to have "actual indebtedness, not proposed indebtedness." However, the Auditor did not directly challenge the accuracy of the Agency's cost projections nor did he assert he would refuse to disburse tax increments until the Agency incurred verifiable indebtedness by issuing bonds, obtaining loans or entering into some other kind of credit transaction. Rather, the Auditor stated that if he had been provided with invoices, purchase orders, and subcontracts showing actual amounts to be paid as opposed to estimates, he would have released the tax increments as requested.

The Auditor conceded the Sequoia DDA was a binding contract compelling the Agency to expend money towards the completion of an approved redevelopment project. However, the Auditor testified it was his belief the 1979 stipulated judgment permitted him to compare the Agency's claimed indebtedness with its liquid assets on hand and to withhold tax increments unless they were necessary to pay obligations the Agency otherwise could not meet (apparently within the coming fiscal year). The Auditor asserted that any tax increment revenues not paid to the Agency should and would be divided among several other local tax entities such as the school and community college districts, the City of Napa, and the County of Napa.

The trial court held the Agency's estimated expenses under the Sequoia DDA could properly be claimed by the Agency as indebtedness. The court concluded the Sequoia DDA contained binding obligations which required the Agency to expend money and which, if breached, could expose the Agency to liability for damages or other remedies. Because it determined the Agency's costs in performing the Sequoia DDA would exceed the amount of tax increment revenues the Auditor had collected, the court

---

[7]The Auditor's complaint as finally amended included causes of action concerning specific discrepancies in the Agency's various statements of indebtedness. However, at trial the parties stipulated that the principal issue for the court's consideration was whether the estimated expenditures needed to perform the Sequoia DDA qualified as indebtedness under the Community Redevelopment Law and therefore entitled the Agency to receive the tax increment revenues. This issue became the sole question submitted to the trial court and the Court of Appeal.

rendered judgment ordering the Auditor to pay the Agency all the withheld tax increment revenues from 1981-1983 plus interest.

The Auditor appealed and a divided panel of the First District Court of Appeal reversed. Relying upon section 33801, subdivision (c), the only explicit definition of "indebtedness" in the Community Redevelopment Law, the court held the Sequoia DDA did not constitute indebtedness entitling the Agency to receive tax increment revenues because the DDA imposed upon the Agency no contractual obligation "which, if breached, could subject the agency to damages or other liabilities or remedies." (§ 33801, subd. (c).) While recognizing the Sequoia DDA "was concededly a valid, binding contract which imposed rights and duties on both of the contracting parties," the Court of Appeal majority concluded that the only preconveyance liability faced by the Agency for breach of that agreement was disgorgement of the redeveloper's good faith deposit, an obligation the Agency could perform without utilizing the claimed tax increment revenues.

In dissent, Presiding Justice Anderson maintained that the majority had incorrectly determined the remedies available to the redeveloper under the Sequoia DDA and in that connection had impermissibly relied on extrinsic evidence to alter the meaning of clear and unambiguous contract terms. Interpreting those terms the dissent concluded that if the Agency breached the Sequoia DDA before conveyance of the property, the Agency could have substantial liability under the DDA to compensate the redeveloper for its resulting losses. In addition the dissent pointed out that the section 33801 definition of indebtedness only required the Agency to be subject to *some remedy* upon breach and that even disgorgement of the redeveloper's deposit was one such remedy.

Because of the statewide significance of the questions presented, we granted the Agency's petition for review and granted the request of the Community Redevelopment Agencies Association to appear as amicus curiae in support of the Agency's position.

## II. *Discussion*

■ The Agency maintains the concept of "indebtedness" in the Community Redevelopment Law is a broad and flexible one, sufficient to encompass the projected expenditures necessary to perform an agency's executory obligations under a valid redevelopment contract such as the Sequoia DDA. Hence, the Agency contends, its claimed indebtedness in this case—the projected costs of implementing the DDA—entitled it to receive the available tax increment revenues from the Auditor.

The Auditor, on the other hand, contends the term "indebtedness" is used in the Community Redevelopment Law in a much narrower sense. The Auditor urges the Agency's projected DDA expenditures did not constitute indebtedness because there was no sum certain owing to a specific creditor by a date certain at a prescribed interest rate. In the Auditor's view, tax increment financing should be allocated to the Agency only when it has "actual" indebtedness, not just "proposed" indebtedness.

We conclude the approach to indebtedness the Auditor suggests is inconsistent with the purposes of the redevelopment law, the practical functioning of redevelopment agencies and several statutory provisions relating to tax increment financing.

Semantically, the question presented is the meaning of the term "indebtedness" as used in article XVI, section 16 and in sections 33670 (see fn. 3, *ante*) and section 33675,[8] and related provisions of the redevelopment law. Article XVI, section 16, which authorizes the tax increment financing mechanism for redevelopment projects, uses the word "indebtedness" in the following context: "[Tax increment revenues] shall be paid into a special

---

[8] Section 33675 provides in relevant part: "(a) The portion of taxes required to be allocated pursuant to subdivision (b) of Section 33670 shall be allocated and paid to the agency by the county auditor or officer responsible for the payment of taxes into the funds of the respective taxing agencies pursuant to the procedure contained in this section.

"(b) [Every year] the agency shall file with the county auditor . . . a statement of indebtedness certified to by the chief fiscal officer of the agency for each redevelopment project, the redevelopment plan for which provides for the division of taxes pursuant to Section 33670.

"(c) The statement of indebtedness shall contain for each such redevelopment project:

"(1) The date on which each loan, advance, or indebtedness was incurred or entered into.

"(2) The principal amount, term, purpose, and interest rate, of each loan, advance, or indebtedness.

"(3) The outstanding balance and amount due or to be paid by the agency of each loan, advance, or indebtedness. . . .

"(d) The county auditor or officer shall at the same time . . . as the payment of taxes into the funds of the respective taxing agencies of the county, allocate and pay the portion of taxes [representing the tax increment revenues] provided by subdivision (b) of Section 33670 to each [redevelopment] agency in an amount not to exceed the amount shown on the agency's statement of indebtedness.

"(e) The statement of indebtedness shall be prima facie evidence of the indebtedness of the agency. If the county auditor . . . disputes the amount of indebtedness as shown in the statement of indebtedness, the county auditor . . . shall, within 30 days after receipt of the statement, give written notice to the agency thereof. The agency shall, within 30 days after receipt of such notice, submit such further information as it deems appropriate to substantiate the amount of any indebtedness which has been disputed. If the county auditor . . . still disputes the amount of indebtedness, final written notice thereof shall be given to the agency and the amount disputed may be withheld from allocation and payment to the agency . . . . In such event, the auditor or other officer shall bring an action in the superior court in declaratory relief to determine the matter not later than 90 days after the date of the final notice. The issue in any such action shall involve only the amount of indebtedness, and not the validity of any contract or debt instrument or any expenditures pursuant thereto."

fund of the redevelopment agency *to pay the principal of and interest on loans, moneys advanced to, or indebtedness . . . incurred by such redevelopment agency to finance . . . . in whole or in part, such redevelopment project."* (Italics added.)

We have experienced some difficulty ascertaining the precise parameters of the Auditor's contentions in connection with this issue. Although the Auditor emphasizes the italicized language of article XVI, section 16, and similar language found in section 33670 (see fn. 3, *ante*) and section 33675 (see fn. 8, *ante*), we do not understand the Auditor seriously to contend that the term "indebtedness" is limited to the principal and interest due on notes or bonds issued by the agency or similar debt resulting from borrowing.[9] He has stated repeatedly he would accept as sufficient evidence of qualifying indebtedness invoices, purchase orders or subcontracts showing actual amounts to be paid.

■ In any event, this court has observed in the past that " 'The term "indebtedness" has no rigid or fixed meaning, but rather must be construed in every case in accord with its context.' [Citations.] It can include all financial obligations arising from contract . . . and it encompasses 'obligations which are yet to become due as [well as] those which are already matured.' [Citation.]" (*Carman* v. *Alvord* (1982) 31 Cal.3d 318, 326-327 [182 Cal.Rptr. 506, 644 P.2d 192]; see *Patton* v. *City of Alameda* (1985) 40 Cal.3d 41, 44 [219 Cal.Rptr. 1, 706 P.2d 1135]; *UMF Systems, Inc.* v. *Eltra Corp.* (1976) 17 Cal.3d 753, 756-757 [132 Cal.Rptr. 129, 553 P.2d 225].) ■ We note additionally the relevant axiom of statutory construction that "[a]bsent a single meaning of a statute on its face, we must give it an interpretation based on the legislative intent with which it was passed."

[9] To the extent the italicized language suggests the drafters of the language of article XVI, section 16, like the legislators who imported it verbatim into section 33670, subdivision (b) (see fn. 3, *ante*) and used similar language in section 33675 (see fn. 8, *ante*), may have contemplated that tax increments would most often be used for the repayment of principal and interest on financing obtained by redevelopment agencies from other sources through borrowing rather than for direct payment of front-end costs, the reason would appear to be self-evident. By definition (see fn. 3, *ante*), tax increment revenues are not generally expected to accrue until significant redevelopment has been accomplished and the total assessed value of the subject property has risen, or at least until a significant period of time has passed and the total assessed value has appreciated due to inflationary factors.

Significantly, however, no provision of the Community Redevelopment Law prohibits the use of tax increment revenues by a redevelopment agency to pay directly its front-end costs on a redevelopment project. On the contrary, as we shall discuss, the statutory framework as a whole appears designed to permit the flexible use of tax increment moneys as they accrue to pay any kind of obligation a redevelopment agency may incur. Certain provisions of the Community Redevelopment Law clearly assume that an agency may use tax increment revenue for the acquisition of property (§ 33433) and the construction and acquisition of public improvements on project property (§ 33447). (See discussion, *post.*) In fact, one of the parcels involved in this very project was acquired with tax increment funds.

(*Pasadena Redevelopment Agency* v. *Pooled Money Investment Bd.* (1982) 136 Cal.App.3d 290, 294 [186 Cal.Rptr. 264]; *Benor* v. *Board of Medical Examiners* (1970) 8 Cal.App.3d 542, 546-547 [87 Cal.Rptr. 415]; see *Tyrone* v. *Kelley* (1973) 9 Cal.3d 1, 10-11 [106 Cal.Rptr. 761, 507 P.2d 65].)

 The purposes of the Community Redevelopment Law, together with the structure and processes it creates, support the broad interpretation of "indebtedness" advanced by the Agency. Recently reaffirmed by the Legislature, the purposes of the Community Redevelopment Law include (1) the creation of physical, social, economic, and environmental conditions to remove and prevent the recurrence of blight; (2) the creation of jobs and low-to-moderate income housing; and (3) the attraction of private investment towards these ends. (§ 33334.6, subd. (a); see Stats. 1987, ch. 1111, § 1, No. 4 Deering's Adv. Legis. Service, p. 3873.)

In furtherance of these objectives the Legislature has established in each community a redevelopment agency (§ 33100) which is primarily responsible for implementing the Community Redevelopment Law and which is empowered to prepare and effectuate a redevelopment plan for the elimination of blighted areas in the community. (*Redevelopment Agency* v. *Malaki* (1963) 216 Cal.App.2d 480, 482 [31 Cal.Rptr. 92]; *Redevelopment Agency* v. *Hayes* (1954) 122 Cal.App.2d 777, 800-802 [266 P.2d 105]; Jacobs & Levine, *Redevelopment: Making Misused and Disused Land Available and Usable* (1957) 8 Hastings L.J. 241, 250-253.) Redevelopment agencies are endowed with broad powers to acquire property through purchase and condemnation (§ 33391) and to "[m]ake and execute contracts and other instruments necessary" to complete redevelopment projects (§ 33125, subd. (c)). Redevelopment agencies chiefly rely upon tax increment revenues to finance their activities, and section 33670, subdivision (b) expressly authorizes the use of tax increment funds by redevelopment agencies to repay any indebtedness incurred in implementing the redevelopment project.

Since redevelopment agencies are statutorily empowered to enter into binding contracts to complete redevelopment projects, the term "indebtedness" must be interpreted in a way that will enable those agencies to perform their contractual obligations. In this light, we think it clear that "indebtedness" was meant to include all redevelopment agency obligations, whether pursuant to an executory contract, a performed contract or to repay principal and interest on bonds or loans. To insure its ability to perform its obligations, a redevelopment agency is entitled to all tax increment funds as they become available, until its "loans, advances and indebtedness, if any, and interest thereon have been paid . . . ." (Art. XVI, § 16; § 33670 [see fn. 3, *ante*].)

The financial scheme prescribed in the California Constitution and the Community Redevelopment Law relating to the operation of redevelopment agencies likewise compels acceptance of the Agency's interpretation of "indebtedness." Article XVI, section 16, and section 33670, subdivision (b) dictate that tax increment revenues *"shall be allocated to* and when collected *shall be paid into a special fund of the redevelopment agency"* to pay its indebtedness. (Italics added.) The very notion of a "special fund of the redevelopment agency" plainly implies that the agency itself will control the utilization of tax increment funds and militates against the notion of a process budgetarily controlled by county auditors. This reading of the "special fund" language is virtually mandated by section 33603, the carry-over provision, which authorizes redevelopment agencies to "invest any money held in reserves or sinking funds, or any money not required for immediate disbursement, in property or securities . . ." and section 33670 which mandates payment of tax increment revenues into the "special fund" until the agency's "loans, advances and indebtedness, if any, and interest thereon have been paid" (see fn. 3, *ante*). Thus, the Auditor's notion that available tax increment funds not needed for expenditure in the upcoming fiscal year are to be distributed to other tax entities is wholly incorrect. It is clear the Legislature contemplated the "special fund" would provide a reliable fund of money to be used to pay any and all obligations incurred by a redevelopment agency and that up to the amount of the agency's total indebtedness, tax increment revenues not expended currently would be accumulated for payment of such indebtedness when due.

Two additional provisions of the Community Redevelopment Law disclose legislative contemplation that tax increment revenues may be spent directly upon preconveyance obligations such as those in the present case. Section 33433, which subjects the proposed sale or lease of agency-owned property to a notice and hearing process, describes the affected agency property in the following terms: "[B]efore any property of the agency *acquired in whole or in part,* directly or indirectly, *with tax increment moneys* is sold or leased . . . , the sale or lease shall first be approved by the legislative body after public hearing." (Italics added.) It is thus clear an agency may use tax increment revenues to purchase property. Section 33447 gives redevelopment agencies full authority to spend tax increment moneys directly upon certain public improvements: "[T]axes levied in a project area and allocated to the agency as provided in subdivision (b) of Section 33670 may be used as provided thereby anywhere within the territorial jurisdiction of the agency *to finance the construction or acquisition of public improvements . . . ."* (§ 33447, subds. (a) & (c) [limiting improvements to street, sewer, storm drainage and recreational projects], italics added.)

Additional support for the Agency's position, if further support were needed, is found in section 33801, which embodies the Legislature's only

attempt at specifically defining "indebtedness" in the redevelopment context and which both parties rely on. Section 33801 provides in relevant part: " 'Indebtedness' means *any obligations* incurred by a redevelopment agency prior to July 1, 1978, the payment of which is to be made in whole or in part out of taxes allocated to the agency pursuant to Section 33670 and includes: . . . (c) *A contractual obligation which, if breached, could subject the agency to damages or other liabilities or remedies.*"[10] (Italics added.)

The Court of Appeal majority agreed the Sequoia DDA was "concededly a valid, binding contract which imposed rights and duties on both of the contracting parties" but concluded a preconveyance breach by the Agency could not subject the Agency to "damages or other liabilities or remedies." We conclude to the contrary; the plain language of the DDA shows that a preconveyance breach by the Agency could subject the Agency to "damages or other liabilities or remedies." Section 510 of the Sequoia DDA provides that, in the event of such breach, "this Agreement shall, *at the option of the Redeveloper,* be terminated by written notice thereof to the Agency." (Italics added.) Section 510 further provides that, upon such termination by the redeveloper, the Agency is required (1) to return the redeveloper's good faith deposit as liquidated damages and (2) to negotiate in good faith with the developer for an "alternate approach" to completion of the project. Of course, rescission and restitution have long been recognized as basic contract remedies (see generally, *Alder v. Drudis* (1947) 30 Cal.2d 372, 383-384 [182 P.2d 195]); the added right of the redeveloper to compel a good faith renegotiation is another significant remedy. Over and above the rescissory right, sections 506 and 507 of the Sequoia DDA permit the redeveloper to sue for damages or specific performance, respectively. Thus, a preconveyance breach by the Agency of the Sequoia DDA could have subjected it to

---

[10]Section 33801 is part of chapter 9 of the Community Redevelopment Law (§§ 33800-33855), added as an urgency measure in 1979. (Stats. 1979, ch. 29, § 3, pp. 74-76.) In enacting that measure the Legislature sought to remedy a perceived threat posed to tax increment financing by the voters' adoption of Proposition 13 in 1978, which created article XIII A of the California Constitution. (See §§ 33810-33816; see generally *Huntington Park Redevelopment Agency v. Martin* (1985) 38 Cal.3d 100, 104 [211 Cal.Rptr. 133, 695 P.2d 220]; 66 Ops.Cal.Atty.Gen. 231, 232 (1983); Schuster & Recht, *Tax Allocation Bonds in California After Proposition 13* (1983) 14 Pacific L.J. 159, 160, 176-177.) Chapter 9 of the Community Redevelopment Law confers upon redevelopment agencies the authority to seek the levy of special assessments upon property within redevelopment projects when existing tax increment revenues are insufficient to repay agency indebtedness. (See Legis. Counsel's Dig., Sen. Bill No. 55 (1978-1979 Reg. Sess.).)

The Agency's claimed indebtedness in this case was not incurred until 1980, well after the July 1, 1978, date specified in section 33801. Additionally, the present dispute does not involve special assessments. Therefore the section 33801 definition of indebtedness is not directly applicable here. But because it represents the Legislature's only attempt at defining "indebtedness" in the redevelopment context, we agree with the parties that section 33801 is helpful in divining the meaning of "indebtedness" in sections 33670 and 33675.

liability for "damages or other liabilities or remedies." (§ 33801, subd. (c).) The DDA is not reasonably susceptible to any other interpretation.[11]

The Auditor concedes the Agency could issue bonds to finance performance of its obligations under the Sequoia DDA and the principal and interest to be paid on such bonds would constitute indebtedness entitling the Agency to available tax increment revenues. And as amicus curiae aptly points out, it would be unreasonable to interpret the Community Redevelopment Law to require that agencies borrow money or sell bonds in order to gain access to tax increment revenues. Such a ruling would compel an agency to incur substantial interest expense unnecessarily. No legitimate redevelopment objective or fiscal policy would be served by limiting the meaning of indebtedness so as to require that.

Not surprisingly, the record indicates the Auditor's position is inconsistent with the administrative practice of other county auditors in the state. At trial the Agency introduced the testimony of Murray Kane, an attorney and redevelopment expert. Kane testified it was rather uniform practice among his redevelopment agency clients to claim as indebtedness their projected expenditures required to comply with DDA's. Kane stated such costs were regularly treated as indebtedness by the tax auditors in at least four counties around the state, including Los Angeles. Kane's testimony was uncontroverted and constitutes the only evidence in the record regarding the relevant administrative practice. This court has been reluctant to disturb evident administrative practices in the area of redevelopment finance under which vested rights may have developed. (See *Redevelopment Agency* v. *County of San Bernardino* (1978) 21 Cal.3d 255, 266 [145 Cal.Rptr. 886, 578 P.2d 133].) While the record before us does not indicate this administrative interpretation has been firmly established over a lengthy time, the record does show that the approach to indebtedness urged by the Agency is utilized by a number of county auditors and redevelopment agencies.

---

[11] The erroneous result in the Court of Appeal stemmed in part from its improper reliance upon extrinsic evidence. That evidence related to the history of the Agency's prior dispute with Nichandros during the 1970's, which resulted in years of litigation and an eventual payment by the Agency of some $400,000 in settlement. The Court of Appeal concluded that the Agency thereafter had negotiated section 510 of the DDA to provide that termination and return of the deposit would be the redeveloper's *exclusive* remedies in the event of the Agency's preconveyance breach. However, the plain language of the DDA in this case contradicts the majority's belief that termination was the redeveloper's exclusive remedy; section 510 of the DDA plainly states that termination would occur only at the redeveloper's option. As Presiding Justice Anderson stated in dissent: "[I]t is axiomatic that where, as here, the contract is clear and unambiguous, the intention of the parties should be ascertained from the writing itself and in such an instance extrinsic evidence is inadmissible. (Civ. Code, § 1639; *Estate of Wemyss* (1975) 49 Cal.App.3d 53, 59 [122 Cal.Rptr. 134]; *Eastern-Columbia* v. *System Auto Parks* (1950) 100 Cal.App.2d 541, 545 [224 P.2d 37].)"

Indeed, since this court has taken judicial notice of the Agency's 1980-1981 statement of indebtedness (see fn. 5, *ante*), the record indicates the Auditor himself has treated the Agency's contractual obligations under this very DDA as qualifying indebtedness in the past. For 1980-1981 the Agency claimed $800,000 of indebtedness to implement the Sequoia DDA, and the record plainly shows the Auditor paid the Agency $439,000 in tax increment revenues for that fiscal year on that account. Yet when the Agency claimed the identical source and kind of indebtedness in its statement of indebtedness for 1981-1982 and 1982-1983, the Auditor refused to pay, and instead instituted the present litigation. The Auditor challenges the probative value of the 1980-1981 statement of indebtedness, but, despite ample opportunity, no explanation has been offered as to why the Agency was entitled to receive tax increment revenues for 1980-1981 to implement the DDA but was not so entitled during the two ensuing fiscal years involved in this case, 1981-1982 and 1982-1983.

Finally, we reject the Auditor's suggestion that acceptance of the Agency's position in this case will inhibit him and other county auditors around the state from performing their function under section 33675 (see fn. 8, *ante*). ██ The suggestion is based on the false premise that under section 33675, the Auditor acts as a kind of guardian of tax increment revenues to ensure that other local tax entities, such as the school and community college districts, the City of Napa, and the County of Napa, receive their fair share.[12] This is true in only the most limited sense: It is the Auditor's function to see that the aggregate amount of tax increment revenues paid to the Agency does not exceed the aggregate of its indebtedness. In other words, it is only when the Agency's total indebtedness has been paid that tax increment revenues are to be paid to the other tax entities. (§ 33670; *Redevelopment Agency* v. *County of San Bernardino, supra,* 21 Cal.3d 255, 259.) Until that time the county auditor is required to pay all available tax increment funds up to the amount of the agency's indebtedness to the redevelopment agency for deposit into its "special fund." While section 33675, subdivision (e), authorizes county auditors to challenge the claimed amount of indebtedness in a declaratory relief action, the issue in such

---

[12]In part the Auditor's position is based upon and reflected in the 1979 stipulated judgment, under which he apparently asserts the budgetary authority to examine the status of the Agency's cash reserves and compare them to the Agency's claimed indebtedness in determining whether tax increment funds are necessary for the Agency to meet its obligations. As we have explained, however, this notion is fundamentally at odds with the scheme established by the Community Redevelopment Law from which it is manifest that the Auditor's function in the collection and allocation of tax increments is primarily administrative. We need not reach this issue, however, because at oral argument the parties agreed that the effect of the stipulated judgment is not before us in this case.

actions is limited to the *amount* of indebtedness and may not involve "the validity of any contract or debt instrument or any expenditures pursuant thereto." (§ 33675, subd. (e).)

Contrary to the position of the Auditor, it is not the purpose of the statement-of-indebtedness procedure to permit other tax entities to share in tax increment revenues at any time before the agency's total indebtedness has been paid or the amount in its "special fund" is sufficient to pay its total indebtedness. (Art. XVI, § 16; § 33670 [see fn. 3, *ante*].) Instead, the Legislature has established mechanisms by which the other affected tax entities may participate in the political process at the time approval of a redevelopment plan which is to utilize tax increment financing is being considered. (E.g., §§ 33327, 33328 [under which affected tax entities receive copies of proposed redevelopment plans and fiscal impact reports thereon by county auditors]; § 33353 et seq. [authorizing the creation of "fiscal review committees," including representatives from affected tax entities, who review the fiscal impacts of proposed redevelopment plans and their use of tax increment financing].) Further, the Community Redevelopment Law contains provisions for annual inflation adjustments and other tax rate adjustments to be applied to the affected tax entities' share of property taxes derived from the property in a redevelopment project (§ 33676; § 33401, subd. (b)). Thus, the Legislature has specifically attended to the interests of tax entities potentially affected by tax increment financing.

*Conclusion*

We conclude that "indebtedness," as it is used in article XVI, section 16 and sections 33670 and 33675, includes redevelopment agencies' executory financial obligations under redevelopment contracts. Such indebtedness entitles those agencies to payment of available tax increment revenues by the local county auditor. This result is consistent with the purposes of redevelopment and with the mechanism by which those revenues are raised. The manifest legislative intent is that available tax increment revenues be furnished to redevelopment agencies so they have a reliable source of funds to pay all indebtedness incurred in the process of redevelopment. To hold otherwise, we are persuaded, would disrupt the orderly scheme of redevelopment financing in California.

Accordingly, the judgment of the Court of Appeal is reversed.

Lucas, C. J., Mosk, J., Broussard, J., Panelli, J., Arguelles, J., and Eagleson, J., concurred.